# EXHIBIT B

**JAMS COMPREHENSIVE ARBITRATION RULES AND PROCEDURES**

———————————————————————————X

In the Matter of an Arbitration Between

ANTI CAPITAL (UPPER CAYMAN) and ANTI  :       **DEMAND FOR**
CAPITAL ASIA LTD,                        **ARBITRATION AND**
                             :       **STATEMENT OF CLAIM**

                             :

             Claimant(s),    :

      and                :

BLUEFIN LABS INC.,           :

          Respondent(s).   :

                             :

———————————————————————————X

**To:** JAMS and the following Respondent(s) and its counsel:

     Bluefin Labs Inc., c/o

     Brian M. Johnson

     300 West Vine Street, Suite 1700,

     Lexington, KY 40507

     859-899-8704

     BJohnson@dickinsonwright.com

     rabeel@bluefin.io

     zabi@bluefin.io

**Please take notice** of the commencement of arbitration as described in the following Demand for Arbitration. Copies of the arbitration agreement and this Demand for Arbitration and Statement of Claim are being filed with JAMS with a request to commence administration of the arbitration. Respondent(s) may file an answering statement after notice from the case administrator.

Claimants Anti Capital (Upper Cayman) ("AC Upper Cayman") and Anti Capital Asia Ltd. ("AC Asia", and collectively with AC Upper Cayman, "Anti Capital"), by and through their undersigned counsel, for their Demand for Arbitration against Respondent Bluefin Labs Inc. ("Bluefin"), hereby allege as follows:

## I. Introduction

1.      This demand for arbitration arises out of a contract dispute between Anti Capital and Bluefin.  Since 2023, Anti Capital has provided critical services to Bluefin related to its trading platform in exchange for the promise of future digital assets set to be released in December 2024. After receiving services from Anti Capital for two years, Bluefin waited until the launch of its digital token, after it fully benefited from Anti Capital's services—including Anti Capital's net deposit and burn of 850,985,720 USDC on the Bluefin trading platform—and then elected to breach its agreements with Anti Capital by refusing to pay.

2.      Bluefin's refusal to pay Anti Capital and its continuing retention of tokens owed to Anti Capital is egregious and without excuse.  The terms of the operative agreements, and related promises conveyed through documented communications postdating the agreements, are clear. Relying upon those agreements and communications, Anti Capital invested significant time and resources over the course of two years.  All the while, Bluefin enjoyed (and continues to enjoy) significant benefits conferred by Anti Capital's work.

3.      For the reasons set forth below, Anti Capital seeks an award of damages in an amount exceeding $5,000,000 for Bluefin's breach of contract, quantum meruit, breach of covenant of good faith and fair dealing, fraudulent inducement, unjust enrichment, and conversion.

### A.  Claimant

4.      Anti Capital was founded in 2022 by Powen Perng and has become a premier boutique trading firm specializing in high-frequency, algorithmic trading across a wide range of asset classes, including digital assets.  It has developed or acquired cutting edge technologies, proprietary algorithms, and low-latency infrastructure that enable it to provide liquidity and market-making solutions for institutional clients.  While it has served many institutional clients, it has also assisted early-stage companies through the deployment of its know-how and ability to bring credibility to such startups.  This dispute arises out of one such arrangement with respondent Bluefin.

5.      Claimant Anti Capital (Upper Cayman) is a Cayman Islands business company, a citizen and resident of Taipei City, Taiwan.  It is located at Rm. 31, 16F., No. 206, Sec. 1, Keelung Rd., Xinyi Dist., Taipei City 110058, Taiwan (R.O.C.) Claimant Anti Capital Asia Ltd, is a Taiwan business also located at Rm. 31, 16F., No. 206, Sec. 1, Keelung Rd., Xinyi Dist., Taipei City 110058, Taiwan (R.O.C.).  Claimants are represented in this arbitration by Brown Rudnick LLP. Claimants' contact information is as follows:

> Anti Capital (Upper Cayman) and Anti Capital Asia Ltd., c/o:
> Stephen D. Palley
> Hayden A. Miller
> Brown Rudnick LLP
> 601 Thirteenth Street NW Suite 600,
> Washington, D.C. 20005
> +1.202.536.1700
> spalley@brownrudnick.com
> hmiller@brownrudnick.com

**B. Respondent**

3

6.      Bluefin Labs Inc. is a citizen and resident of the British Virgin Islands.  It is located at OMC Chambers, Wickhams Cay 1, Road Town Tortola, British Virgin Islands.  Respondent is represented by Dickinson Wright PLLC.  Bluefin's contact information is as follows:

Bluefin Labs Inc., c/o:
Brian M. Johnson
300 West Vine Street, Suite 1700,
Lexington, KY 40507
859-899-8704
BJohnson@dickinsonwright.com

Brian N. Radnoff
199 BAY STREET, SUITE 2200
P.O. BOX 447, COMMERCE COURT POSTAL STATION
TORONTO, ON CANADA M5L 1G4
(416) 777-4046
BRadnoff@dickinsonwright.com

## II. Arbitration

### A. The Arbitration Agreement

7.      This dispute is subject to arbitration under the terms of the Agreement between Anti Capital Asia Ltd. and Bluefin Labs Inc. dated May 18, 2023 (the "Services Agreement") which is attached to this demand as Exhibit A. The relevant portion of the Agreement reads:

> This Agreement will be governed by and construed in accordance with the laws of the State of Delaware, United States, without giving effect to that body of laws pertaining to conflict of laws.  Except as provided below, any dispute arising out of or relating to this Agreement and its formation, breach, performance, interpretation and application, shall be referred to and finally resolved by individual arbitration, and not by class or collective arbitration, in New York, New York by a panel of one (1) arbitrator in accordance with the JAMS Comprehensive Rules and Procedures ("JAMS Rules") for the time being in force which rules are deemed to be incorporated by reference to this clause. English shall be the official language for the arbitration. The arbitrator shall be appointed jointly by both parties and if the parties cannot agree on the identity of the

4

arbitrator within thirty (30) days of the parties' mutual decision to refer the matter to arbitration, the arbitrator is to be designated by JAMS in accordance with JAMS Rules. The award rendered by the arbitrator shall be final and binding on the parties, and judgment thereon may be entered in any court having competent jurisdiction. Notwithstanding anything to the contrary in this Section, neither party will be required to arbitrate any dispute relating to actual or threatened unauthorized disclosure of Confidential Information. Either party will be entitled to seek in a court of competent jurisdiction injunctive relief preventing the disclosure of Confidential Information in breach of the terms of Section 4 hereof, or an order for specific performance to compel the other party to perform its obligation under this Agreement.

### B. Place of Arbitration and Governing Law

8.      In the Services Agreement, the parties agreed that any arbitration will be held in New York, NY (Services Agreement (Ex. A) Section 8).

9.      The Agreement is governed by Delaware law.  (Services Agreement (Ex. A) Section 8.)

### C. Service of Demand for Arbitration

10.      The Claimant served this demand for arbitration on Bluefin and its counsel through both electronic mail and certified mail.

### D. Selection of Arbitrators

11.      In the Services Agreement, the parties agreed that a single arbitrator will be selected by mutual decision or, if such an agreement cannot be reached (within 30 days), an arbitrator to be designated by JAMS in accordance with JAMS rules.  (Services Agreement (Ex. A) Section 8.) Pursuant to the Services Agreement, Anti Capital contacted Bluefin and proposed a list of potential arbitrators on March 4, 2025.  Thirty days has since elapsed, and the parties could not jointly agree upon an arbitrator.  Anti Capital requests that JAMS designate an arbitrator to adjudicate this matter.

## III. Statement of Facts and Claims

5

12.    In 2023, Bluefin began to operate the Bluefin Exchange (the "Exchange"), and associated applications.  The Exchange is a decentralized spot and derivatives trading platform on the Arbitrum blockchain and Sui blockchain.  Users on the Exchange can buy and sell a variety of different digital assets, including well-known tokens such as Bitcoin, Ethereum, and Solana.  Since its founding, Bluefin has sought to attract investors and users by generating significant trading activity on the Exchange.  Due to the efforts of its partners, it has been able to achieve some success.  By its own account, there has been a significant amount of trading on the Bluefin Exchange.  According to Bluefin's public statements, the Exchange saw more than $25 billion in trading volume between January 1, 2024 and July 27, 2024.

13.    In addition to creating a trading platform, Bluefin also created a digital asset, the "Blue token."  The Blue token is a governance token that was launched on December 11, 2024.  It is set to have a maximum supply of 1 billion tokens and an initial circulating supply of 116 million tokens.

14.    In order to drum up attention for its (then) upcoming token launch, Bluefin sought to draw attention to its trading platform.  However, the Exchange struggled to maintain liquidity in critical derivative markets.  This included the perpetual swaps markets for BTC/USDT, ETH/USDT, SOL/USDT, and ARB/USDT.  To that end, Bluefin sought to engage Anti-Capital to provide trading services including volume generation and market-making.  In May 2023, Anti-Capital and Bluefin entered into two related agreements meant to facilitate Anti Capital's investment activity on the Exchange.

15.    ***The Services Agreement***:  On May 18, 2023, AC Asia and Bluefin entered into a services agreement (the "Services Agreement").  As reflected in the Services Agreement, Anti Capital was engaged by Bluefin to provide advice "on strategies for fostering and maintaining

6

liquidity in certain markets for digital assets across different centralized and decentralized exchanges and provide[] market-making services to implement such strategies (the 'services')." (Ex. A, at 1.)  Likewise, Anti Capital was "to engage in discretionary trading to increase liquidity in certain markets, identified below, on Customer's Bluefin decentralized exchange (the "Exchange")."  (*Id.*)  More specifically, "Anti Capital will use commercially reasonable efforts to engage in the provision of Services for the following asset pairs and markets on the Exchange:  a.  BTC/USDT perpetual; b.  ETH/USDT perpetual; c.  SOL/USDT perpetual; d.  ARB/USDT perpetual."  (*Id.* at Section 1(1).)

16.     In return for providing these services, Anti Capital was to be paid: (i) a service fee of $48,000 (*id.* at Section 2); (ii) trading fees equivalent to its costs incurred in connection with providing services (id. at Section 1(4)); and (iii) a success fee tied to the profits generated by Anti Capital's market making in the specified perpetual swaps markets (*id.* at Section 1(2 & 3).  With respect to the success fee, Anti Capital was provided 200,000 USDT (the "Capital Deposit") by Bluefin with which to engage in discretionary trading in the specified markets, and was "entitled to 25% of any net increase in the Capital Deposit, as determined at 5 P.M. Eastern Time (U.S.) on the Termination Date or such other date on which this Agreement terminates . . . ."  (*Id.* at Section 3.)  The Termination Date was initially set at August 16, 2023.  (*Id.* at Section 3 (terminating 90 days after May 18, 2023).)

17.     As discussed further below, the parties amended the terms of the Services Agreement, including the scope of services to be provided and the term of the agreement, through subsequent communications postdating the entry of the Services Agreement.  In relevant part, Bluefin insisted that Anti Capital adopt trading strategies in high volumes that were incapable of generating any net increase in the Capital Deposit.  Accordingly, the existing payment structure

under the Services Agreement was poorly calibrated to incentivize Anti Capital to continue its trading relationship with Bluefin. While Anti Capital was inclined to simply end the engagement, Bluefin repeatedly promised significant compensation, separate from increases in the Capital Deposit, if Anti Capital continued providing market making and trading volume services to Bluefin. In reliance on these promises, Anti Capital ultimately invested approximately 820,985,720 USDC on the Bluefin trading platform.

18.    ***The Loan Agreement***: As a separate inducement to persuade Anti Capital to participate in trading on the Exchange, and in anticipation of entering the Services Agreement, Bluefin "advance[d] by way of a loan to [AC Upper Cayman]" 100,000 USDC through a loan agreement dated May 9, 2023 (the "Loan Agreement"). (Ex. B at 1.) The Loan Agreement provided that Bluefin would "advance the sum of US$100,000 (the 'Loan') on May 15, 2023" and that it would be in the form of "100,000 USDC (ERC20)". (Ex. B at Art. 2.1(a) and (b).) The primary purpose of the loan was to incentivize Anti Capital to use the Exchange as it was not an interest-bearing loan. Anti Capital was not in need of financing and only accepted the loan as part of a transactional structure that Bluefin requested. The fact that this was not intended to be a conventional loan is reinforced by the fact that no interest was contemplated under the agreement. Indeed, it states that "[p]rior to the Maturity Date, no interest shall be payable on the Loan" and the outstanding indebtedness was to be paid one year later on May 15, 2024. (*Id.* at Art. 2.2.)

19.    After entering the Loan Agreement and Services Agreement, Anti Capital proved the merits of its trading strategies by generating significant profit on the Capital Deposit. It enriched Bluefin by increasing trading volume in various perpetual swap markets and other markets per the direction and request of Bluefin. That notwithstanding, Anti Capital did not receive the fees it was entitled to under the Services Agreement. Instead, Anti Capital has spent

8

significant time and resources depositing and burning 820,985,720 USDC in order to generate trading volume on the Bluefin exchange between May 2023 and December 2024 without any compensation.

20.     ***Bluefin Modifies the Services Agreement To Persuade Anti Capital To Continue to Provide Trading Services***:  Shortly after the parties entered the Services Agreement, it became apparent to Anti Capital that Bluefin was a struggling platform and that providing services—*i.e.*, increasing trading volume in selected markets and providing other market making services— would generate losses for Anti Capital.  This was because Bluefin was an emerging platform, and the bid-ask spread in particular markets was volatile and strongly disadvantaged volume generators like Anti Capital.

21.     While Anti Capital preferred to simply cut ties, Bluefin proposed a modification to the Services Agreement that provided Anti Capital with financial incentives to continue providing services.  On May 29, 2023—**ten days after entering the Services Agreement**—, Rabeel Jawaid, one of the co-founders of Bluefin, contacted Maxim Shen and stated that in lieu of generating profit from its market making activity under the Services Agreement, "Anti Capital accounts will be able to start earning rewards.  In terms of what that looks like operationally – does it make sense for Anti Capital to receive all of the rewards (no profit sharing of them [as per the Services Agreement]) but the tokens are first used to cover loses in trading capital and then all of the rewards thereafter belong fully to Anti Capital?"

29 May 2023

 **Rabeel | Bluefin**
Hey Max, we'll be taking the Trade & Earn program live tomorrow and Anti Capital accounts will be able to start earning rewards.

In terms of what that looks like operationally - does it make sense for Anti Capital to receive all of the rewards (no profit sharing of them) but the tokens are first used to cover loses in trading capital and then all of the rewards thereafter belong fully to Anti Capital?

22.     In other words, instead of receiving 25% of any net increase in the Capital Deposit, as per the terms of the Services Agreement, Anti Capital was promised future tokens to be generated by Bluefin as "rewards" that would vest upon the launch of its new cryptocurrency. Additionally, as Mr. Jawaid promised, the "reward" tokens would be used to cover losses that were generated from trading capital, *i.e.*, the repayment of the Loan Agreement would be accomplished through the reward tokens generated by Anti Capital's trading activity.

23.     Also on May 29, 2023, Rabeel further promised that the tokens would vest at the token generation event.  In other words, at the same time as the public launch of Bluefin's "Blue" token, Anti Capital would receive the Blue tokens it was promised as a reward for its trading activity.

Rabeel | Bluefin
They're in points that convert to tokens at TGE in ~2 months

24.     This promise that Anti Capital would receive Blue tokens at the "TGE" or Token Generation Event induced Anti Capital to continue obtaining rewards through its trading activity. Additionally, as Rabeel indicated, it was expected that the Blue token would be launched within two months (*i.e.*, as of July 2023).  This meant that the proceeds from the reward tokens would be available to Anti Capital to repay Bluefin well in advance of the maturity date under the Loan Agreement.  Accordingly, Bluefin, who was best positioned to know the viability of token project, made serious representations to Anti Capital to convince it to accept an alternative payment structure.

25.     Based on these representations, Anti Capital went to work and engaged in the new trading strategies requested by Bluefin that were incapable of generating profit outside of the

10

reward tokens.  Concurrently, Anti Capital's investments provided significant benefits to Bluefin. For instance, on June 8, 2023, Rabeel acknowledged that Anti Capital was providing a significant portion of the trading activity on its platform – approaching $3 million per day.



26.    Throughout this time, Bluefin directed Anti Capital to increase trading volume in a wide range of markets beyond the scope of the Services Agreement (reflecting the modification of its terms).  For example, on June 13, 2023, Rabeel instructed Anti Capital to increase its trading volume in Bitcoin and Ethereum and insisted upon 2-3 million USDC in daily trading volume in these markets.  In exchange, Rabeel promised lucrative rewards to Anti Capital for its trading volume.



27.    Throughout 2023 and 2024, Rabeel asked Anti Capital to increase its trading volume and directed Anti Capital to provide services for additional markets on the Exchange. For instance, on June 19, 2023, Rabeel contacted Anti Capital and noted that as of 1pm, Anti Capital had traded approximately 940,001 USDC (that day), and requested that Anti Capital increase its trading volume.



28.    Bluefin was well aware of the benefits it generated from Anti Capital's trading activities. By Rabeel's own admission, Bluefin knew that as of June 27, 2023, Anti Capital had generated $170,000,000 in trading volume. Rabeel also directed Anti Capital as to trading strategies it wanted to see implemented including that Anti Capital would "focus[] only on ETH and BTC (largely ETH) where the slippage is a lot lower," "increase[] trade size so that the gas fee expense is better," and "deploy[] ARB strategies so the PNL profile is better."

29.    Given the failings of Bluefin's platform, Anti Capital continued to lose money through the trading activity that Rabeel and Bluefin insisted upon.  Appreciating this situation, on July 19, 2023, Bluefin promised Anti Capital that it would double the reward tokens to induce Anti Capital to continue providing liquidity services.  He also confirmed that the Services Agreement had been modified to provide future token-based compensation.  On that date, Rabeel stated "I saw that our advisory contract had a token component with a timeline that would result in a cash conversion if we didn't launch the token soon enough.  It's important for us to launch with a high token price and we're closely tracking our DEX market share and will launch the token once we're well-positioned to do so (this might not be until November this year [i.e., 2023]).  Our upcoming launch of the market maker program will help with improved liquidity and institutional onboarding – and the launch on Sui will position us as the fastest decentralized exchange . . . Would you be open to considering a 2X increase in the token amount instead?  This would be mutually beneficial since: We would be able to reduce our cash cost right now.  You'd be receiving double the token amount and have a larger vested share in us with the tradeoff being that you'd have to wait longer for the liquidity event."

30.    Based on the promise of significant future token rewards, Anti Capital continued to provide services to Bluefin between May 2023 and December 2024.  Throughout that time, Bluefin was well aware of the trading strategies pursued by Anti Capital and directed Anti Capital on what trading it wanted Anti Capital to pursue.  Despite Anti Capital's significant work, and patience with the delayed launch of the Blue token, Bluefin began to initiate arbitrary acts to reduce Anti Capital's compensation.  For instance, in August 2023, Bluefin unilaterally removed a tranche of 143,132 reward tokens to which Anti Capital was entitled.  The removal of the reward was

13

pretextual and without merit. Anti Capital at all times insisted that it was entitled to return of those reward tokens and demanded the same from Bluefin.

31.     ***The Parties Further Memorialize the Modifications to The Loan Agreement***: Throughout 2023 and 2024, Bluefin failed to launch the Blue token, despite Rabeel's representation that the Blue token would launch in July 2023, and then later November 2023. As of May 2024, the launch of the Blue token had still not occurred and the maturity date on the Loan Agreement was fast approaching. Given that the entire premise of the modified Services Agreement was to induce Anti Capital to provide trading services in exchange for the promise of future tokens, and that the token rewards would be used to repay any outstanding loan amount, the parties agreed to extend the maturity date on the Loan Agreement and further memorialize the token-based compensation arrangement.

32.     On May 24, 2024, AC Asia, AC Upper Cayman, and Bluefin entered into an agreement modifying the Loan Agreement (the "Mutual Modification" (Ex. C)). Pursuant to the Mutual Modification, AC Asia returned half of the Capital Deposit under the Services Agreement (100,000 USDC). The remaining 100,000 USDC Capital Deposit would be used to continue to generate trading volume on the Exchange, and the 100,000 USDC outstanding loan balance would not accrue any interest. The agreement to extend the loan without any interest reflected the parties understanding that Anti Capital was providing services to Bluefin in reliance upon future compensation in tokens, and that Bluefin's failure to timely launch the Blue token prevented repayment of the Loan. It was also necessary to extend the loan maturity date in order to convince Anti Capital to continue providing services to Bluefin. As of May 2024, Anti Capital had provided its trading services to Bluefin for over one year without receiving meaningful compensation. All the while, Bluefin was significantly enriched.

33.     In order to realign incentives, it was agreed that the reward tokens owed to Anti Capital for its market making and trading volume boosting activities were expected to be used to repay the loan.  The repayment schedule for Anti Capital was negotiated to ensure that Anti Capital had received its reward tokens prior to any maturity date for repayment.

34.     As set forth in the Mutual Modification, Section 1.2:

The parties agree that notwithstanding the fact that the Outstanding Indebtedness of 100,000 USDC was not repaid on the Maturity Date, the aggregate amount of the Outstanding Indebtedness and the remaining 100,000 USDC of the Capital Deposit (collectively, the "Outstanding Amount") shall be repaid as follows

(a)  on the date that is one month following the Blue token ("BLUE") Token Genesis Event ("TGE"), if the aggregate value of the aggregate BLUE unlocked and received Anti Capital and Anti Capital Asia (calculated based on the time-weighted average trading price of BLUE for the 7 days prior to such date based on the trading prices reported at www.coinmarketcap.com ("7-Day TWAP")) (the "First Month BLUE Amount") is equal to or greater than the Outstanding Amount , Anti Capital and Anti Capital Asia agree to immediately repay the Outstanding Amount to Customer. If the First Month Blue Amount is less than the Outstanding Amount, then Anti Capital and Anti Capital Asia agree to repay to Customer such amount in USDC as is equal to the First Month BLUE Amount;

(b) on the date that is two months following the TGE, if the aggregate value of the aggregate BLUE unlocked and received by Anti Capital and Anti Capital Asia (calculated based on the 7-Day TWAP prior to such date) (the "Second Month BLUE Amount") is equal to or greater than the Outstanding Amount less the amount paid under Section 1.2(a), then Anti Capital and Anti Capital Asia agree to immediately repay the remaining amount of the Outstanding Amount to Customer. If the Second Month BLUE Amount is less than such remaining Outstanding Amount, then Anti Capital and Anti Capital Asia agree to repay to Customer such amount in USDC as is equal to the Second Month BLUE Amount; and

(c) on the date that is three months following the TGE, Anti Capital and Anti Capital Asia shall pay the remaining outstanding amount of the Outstanding Amount, if any.

35.     As reflected in the Mutual Modification: (i) it was understood by all parties that the Services Agreement had been amended through communications between Rabeel and Anti Capital,

15

including because the Mutual Modification reflects that Anti Capital's compensation for its services was in the form of Blue tokens, (ii) Anti Capital's repayment of any loan would be pushed back until the Blue token launch, and (iii) Anti Capital's repayment of the loan continued to be without interest and would be deducted from the Blue tokens awarded to Anti Capital. This new arrangement was necessary to keep Anti Capital motivated to continue trading on the Bluefin platform and enabled Bluefin to use the promise of future tokens, rather than present cash, to obtain valuable services from Anti Capital.

36. In order to realize this arrangement, Anti Capital needed to receive the Blue tokens at, or shortly after, the TGE (and thereafter repay Bluefin). For that reason, the Mutual Modification states that "Anti Capital will keep all Bluefin points or Blue tokens earned through its trading accounts." (Mutual Modification (Ex. C) at Section 1.3.) This grant of Blue tokens is unconditional by design and ensures that Anti Capital would be able to redeem its Blue tokens (and Bluefin points) generated through its services without submitting to any lock-up period or any other restriction. When the parties intended to impose a lock-up on Anti Capital's compensation, they did so expressly. For instance, the Mutual Modification provides that a small tranche of Blue tokens would be delivered one month after the Blue token launch. (*Id.* at Section 1.4 (stating that Bluefin "shall deliver 143,132 Blue tokens to Anti Capital Asia one month following TGE [*i.e.*, the Blue token launch]").)

37. Bluefin also publicly advertised that it would make Blue tokens immediately available to reward recipients at the TGE. Bluefin publicly stated that

> Users have been accumulating points through various campaigns throughout Bluefin's history (Trade & Earn, Stable Pools, LPing on Spot, etc.). These points will be directly converted to tokens and form part of the user's "Historical Rewards," with 80% of them being claimable at TGE [i.e., Blue token launch]. The remaining 20% will be unlocked in the following 2 months (10% each month).

16

The other part of the tokens unlocked at TGE will correspond to the Bluefin Airdrop.  Users will be able to claim 50% of their airdrop allocation at TGE and the remaining 50% will be unlocked in the following 2 months (25% each month).[1]

38.    While there are no lock-up restrictions imposed on Anti Capital under the terms of the Services Agreement or Mutual Modification, it bears noting that terms of the Mutual Modification reflects an understanding that Anti Capital would be able to repay Bluefin with tokens that are available both one month and two months after the Blue token launch.  This is entirely consistent with Bluefin's promises to Anti Capital in written communications.

39.    In reliance upon the promises contained in each of the Services Agreement, (as amended through subsequent communications), oral promises from Rabeel, the Loan Agreement, and Mutual Modification, Anti Capital honored its end of the bargain, and it actively invested through the Exchange.

40.    ***Bluefin Advertises Trading Volume Generated by Anti Capital***:  Among other things, Bluefin prominently advertised, attracted users, and (on information and belief) was able to engage in fundraising by citing to financial data related to investment activity generated by Anti Capital.  Since entering the agreements at issue in this litigation it has repeatedly advertised its trading volume as a key demonstration of Bluefin's value and potential as a trading platform.  For instance, on December 14, 2024, Bluefin proudly announced that it had "surpassed $40 billion in all-time trading volume – powering the majority of trading activity on @SuiNetwork."

---

[1] "Bluefin Airdrop Explained," available at https://learn.bluefin.io/bluefin/bluefin-airdrop/bluefin-airdrop-explained



41.     These successes were driven, in part, by the work of Anti Capital. Between May 2023 and January 2025, Anti Capital had net deposited and burnt 850,985,720 USDC from trading on Bluefin. In return, Anti Capital was awarded over 6,394,307.54 Blue tokens as reflected on Bluefin's own applications.



42.     On December 11, 2024, the Blue token was launched.  As discussed above, this triggered Anti Capital's right to receive Blue token awards it had accumulated over several years of hard work.  The award should have been 6,537,439.54 Blue tokens (inclusive of the improperly seized 143,132 Tokens).  Subsequently, the Blue token reached a price of 0.86 USDC (~$0.86) per token on December 15, 2024.  During the first seven days of trading, the time-weighted-average-

19

price on the Blue token was approximately 0.485 USDC (~$0.485). Accordingly, had Anti Capital received its award upon launch, it could have generated a return exceeding 5.6 million USDC. This amount would have enabled Anti Capital to promptly repay the outstanding loan and result in a net return to Anti Capital of over $5,400,000 in profits after repaying the 200,000 USDC owed to Bluefin.

43.    However, Bluefin did not furnish Anti Capital with the Blue tokens on December 11, 2024. Instead, Bluefin attempted to avoid its contractual obligations by demanding the repayment of the outstanding loan amount without furnishing Anti Capital with any Blue tokens. On Jan 2, 2025, Bluefin wrote to Anti Capital and stated:

> Due to missed KPIs, Anti's token holdings will be subject to 3 years of vesting with a 1-year cliff. This adjustment will take effect if the 200k is returned within 30 days. If the trading capital is not returned, the rewards will be forfeited.
>
> Also, as previously communicated, a portion of Anti's rewards in the past were also slashed due to unethical trading activity.
>
> Bluefin will continue to take strict action against unmet KPIs and trading activity that does not comply with the platform's terms of use.

44.    The threat by Bluefin to strip Anti Capital of its entire compensation for years of work was facially meritless. None of the operative agreements including the Loan Agreement, Services Agreement, or the Mutual Modification subject the award of Blue tokens to the achievement of "KPIs" or "Key Performance Indicators." Notably, Bluefin failed to even state which supposed "KPIs" were not achieved. On information and belief, Bluefin invented the supposed "missed KPIs" as a pretense to avoid paying Anti Capital.

45.    Likewise, Bluefin's accusation that Anti Capital engaged in "unethical trading activity" is libelous, and Anti Capital reserves the right to initiate litigation relating to this accusation should it be more broadly disseminated. At all times, Anti Capital engaged in ethical

trading.  The supposed "unethical trading" was a function of Bluefin's flawed platform.  Anti Capital did not seek to exploit the technical flaws of the Bluefin platform.  To the contrary, it alerted Bluefin to the issues with the platform and advised it on how to install safeguards.  Bluefin even implemented safeguards at the advice of Anti Capital.  Bluefin knew the accusation that Anti Capital engaged in unethical trading was false and sought to use the threat of further defaming Anti Capital as a cudgel to avoid paying Anti Capital what it was owed.

46.    Likewise, Bluefin's argument that it was entitled to the repayment of its 200,000 USDC loan (*i.e.*, the 100,000 capital deposit and remaining 100,000 loan amount) prior to paying Anti Capital is contrary to the express language of the Mutual Modification.  Under the Mutual Modification, the loan is only to be repaid *after* Anti Capital receives Blue tokens which it may use to repay Bluefin.  (Mutual Modification, Ex. C, at 1.2.)  Accordingly, the proper sequence established under the Mutual Modification is that Bluefin pays Anti Capital approximately 6.5 million Blue tokens and Anti Capital repays 200,000 USDC to Bluefin.  The initial payment of Blue tokens is a condition precedent to the repayment of loans to Bluefin and, accordingly, the loan is not due or outstanding until such time as Bluefin pays Anti Capital what it is owed.

47.    As of January 3, 2025, the day after Bluefin disclaimed its obligation to pay Anti Capital its reward tokens, the Blue token was trading at high price of roughly 0.50 USD, reflecting a value of Anti Capital's reward tokens exceeding 3.2 million USDC.

48.    On January 6, 2025 and later on January 16, 2025, Anti Capital responded to Bluefin, explained that under the operative agreements it was entitled to receive Blue tokens, that the statements made by Bluefin were libelous, and made clear that Bluefin's continued withholding of past-due tokens gave rise to liability.

49.     Nonetheless, Bluefin has refused to honor its contractual commitments and continues to adopt frivolous positions.  It refused (and continues to refuse) to furnish the Blue tokens owed to Anti Capital and claimed the right to steal these tokens for itself under the guise that millions of dollars of digital assets were "forfeited."

**First Claim**

**(Breach of Contract, Services Agreement)**

50.     Anti Capital realleges and incorporates all previous paragraphs as if set forth herein.

51.     On May 18, 2023, Anti Capital and Bluefin entered into the Services Agreement.

52.     The Services Agreement is a valid, binding agreement, pursuant to which Anti Capital performed his obligations.

53.     The Services Agreement required Bluefin to, among other things, pay Anti Capital 6,537,439.54 Blue tokens for services rendered between May 2023 and December 2024.

54.     Bluefin refused to pay Anti Capital.

55.     Anti Capital has been damaged as a result in an amount to be determined at trial, but no less than $5 million, plus interest.

**Second Claim**

**(Breach of Contract, Loan Agreement)**

56.     Anti Capital realleges and incorporates all previous paragraphs as if set forth herein.

57.     On May 9, 2023, Anti Capital and Bluefin entered into the Loan Agreement.

58.     The Loan Agreement is a valid, binding agreement, pursuant to which Anti Capital performed his obligations.

59.     The Loan Agreement requires Bluefin to, among other things, furnish Anti Capital with approximately 6,537,439.54 Blue tokens before calling in any loan obligations.

60. Bluefin demanded the repayment before paying Anti Capital outstanding Blue tokens.

61. Anti Capital has been damaged as a result in an amount to be determined at trial, but no less than $5 million, plus interest.

62. Given Bluefin's breach of its obligation to pay Anti Capital, Anti Capital is relieved of any obligation to repay Bluefin pursuant to the Loan Agreement.

## Third Claim
### (Breach of Contract, Mutual Modification)

63. Anti Capital realleges and incorporates all previous paragraphs as if set forth herein.

64. On May 18, 2024, Anti Capital and Bluefin entered into the Mutual Modification.

65. The Mutual Modification is a valid, binding agreement, pursuant to which Anti Capital performed his obligations.

66. The Services Agreement requires Bluefin to, among other things, pay Anti Capital 6,537,439.54 million Blue tokens for services rendered between May 2023 and December 2024 prior to any loan repayment.

67. Bluefin refused to pay Anti Capital.

68. Anti Capital has been damaged as a result in an amount to be determined at trial, but no less than $5 million, plus interest.

69. Given Bluefin's breach of its obligation to pay Anti Capital, Anti Capital is relieved of any obligation to repay Bluefin pursuant to the Mutual Modification.

## Fourth Claim
### (Quantum Meruit) (in the alternative)

70. Anti Capital realleges and incorporates all previous paragraphs as if set forth herein.

71. Between May 18, 2023 and December 11, 2024, Anti Capital reasonably expected to receive Blue tokens from Bluefin based on promises made by Bluefin.

72. Bluefin was on notice that Anti Capital expected to be paid for his services, including through the publication of Anti Capital's awards, the payment schedule arranged in the Mutual Modification, and other contemporaneous communications.

73. Anti Capital's services were of value to Bluefin in an amount to be determined at trial, but no less than approximately $5 million, plus interest.

## Fifth Claim
### (Breach of Implied Covenant of Good Faith and Fair Dealing) (in the alternative)

74. Anti Capital realleges and incorporates all previous paragraphs as if set forth herein.

75. The implied covenant of good faith and fair dealing is inherent in all contracts, including the Services Agreement.

76. Bluefin was bound by an implied contractual obligation to provide Anti Capital with 6,537,439.54 Blue tokens.

77. Bluefin breached this implied contractual obligation by disclaiming any obligation to pay Anti Capital and improperly withholding the reward tokens.

78. As a result of Bluefin's breach of the implied covenant of good faith and fair dealing, Anti Capital has suffered damages in an amount to be determined at trial, but no less than approximately $5 million, plus interest and punitive damages.

## Sixth Claim
### (Conversion)

79. Anti Capital realleges and incorporates all previous paragraphs as if set forth herein.

24

80. Between December 11, 2024, and March 11, 2025, Anti Capital was entitled to receive 6,537,439.54 Blue tokens as set forth in the Services Agreement and Mutual Modification.

81. Bluefin, knowingly, and intentionally withheld such Blue tokens for the benefit of Bluefin.

82. Bluefin deprived Anti Capital of the benefits of owning 6,537,439.54 Blue tokens by, among other things, falsely asserting that the tokens were subject to lock-up, KPI performance, or were forfeited due to unethical trading.

83. By denying Anti Capital ownership of and right to 6,537,439.54 Blue tokens, Bluefin wrongly, and intentionally converted Anti Capital's Blue tokens.

84. As a result of Bluefin's conversion, Anti Capital has suffered damages in an amount to be determined at trial, but no less than approximately $5 million, plus interest and punitive damages.

## Seventh Claim
### (Unjust Enrichment) (in the alternative)

85. Anti Capital realleges and incorporates all previous paragraphs as if set forth herein.

86. In the alternative to the Breach of Contract Claim against Bluefin, Anti Capital pleads that Bluefin unjustly enriched itself by receiving the market making, trading volume boosting, and other trading services provided by Anti Capital under the Services Agreement, Loan Agreement, and Mutual Modification without consideration.

87. Between May 2023 and December 11, 2024, Anti Capital provided market making, trading volume boosting, and other trading services to Bluefin, including, but not limited to, trading in various perpetual swaps markets on the Exchange.

25

88.     Anti Capital expended significant time, resources, and deployed capital in relation to the market making services.

89.     Bluefin knowingly received and benefitted from Anti Capital's market making services without any payment or consideration, which is the unjust retention of a benefit to the loss of Anti Capital.

90.     As a direct and proximate result of Bluefin's unjust enrichment at Anti Capital's expense, Anti Capital has suffered and will continue to suffer damages in an amount to be determined at trial, but no less than approximately $5 million, plus interest and punitive damages.

## Eighth Claim
### (Fraudulent Inducement)

91.     Anti Capital realleges and incorporates all previous paragraphs as if set forth herein.

92.     In the alternative to the Breach of Contract Claim against Bluefin, Anti Capital pleads that Bluefin knowingly and falsely represented that it would reward Anti Capital with reward tokens in order to induce Anti Capital into continuing to provide volume boosting trading services between May 2023 and December 2024.

93.     Bluefin's public marketing strategy was premised upon representing that it had significant trading volume on its platform.  In order to generate this volume, it needed contributions from Anti Capital.

94.     Between May 2023 and December 2024, Bluefin's founders directly contacted Anti Capital and implored them to continue engaging in trading activities and made promises that Anti Capital would receive lucrative reward tokens upon the launch of the Blue token.

95.     Bluefin's founders also knew that the existing Services Agreement compensation structure would not result in any payment to Anti Capital, and that they needed to create a new incentive structure in order to convince Anti Capital to generate trading volume on the Exchange.

96.     On information and belief, and based upon Bluefin's incredulous recent positions, Bluefin had never intended to pay Anti Capital, and had always intended to lie to Anti Capital in order to obtain its services.

97.     Anti Capital was induced by the promise of future tokens to provide significant services.  Between May 2023 and December 2024, it net deposited and burnt 850,985,720 USDC from trading on the Exchange.

98.     Anti Capital reasonably relied upon promises from Bluefin's own founder—Rabeel—because the promise of future tokens to pre-launch advisors and consultants is a standard compensation structure in emerging blockchain companies, and Anti Capital had received the promises directly from Bluefin's co-founder.

99.     In reliance on Bluefin's false promises, Anti Capital has suffered and will continue to suffer damages in an amount to be determined at trial, but no less than approximately $5 million, plus interest and punitive damages

## IV. Relief Sought

WHEREFORE, Anti Capital respectfully demands an award in its favor against Bluefin for:

    a.   damages in an amount to be determined at a Hearing but no less than approximately $5,000,000;

    b.   pre-judgment and post-judgment interest;

c.   costs and expenses, including attorneys' fees and expenses, incurred by Anti Capital

in connection with these claims;

d.   an award of specific performance of the Services Agreement, including Bluefin's

obligation to deliver Blue tokens to Anti Capital;

e.   a declaration that Bluefin is not entitled to repayment under the Mutual

Modification and Loan Agreement given its material breach of its obligation to pay

Anti Capital 6,537,439.54 Blue tokens;

f.   such other relief as the Arbitrator may deem just and proper.

Dated: April 7, 2025
Washington, D.C

Respectfully submitted,

By:_____
Stephen D. Palley, Esq.
Brown Rudnick, LLP
601 13th Street NW, #600
Washington, DC 20005
Phone: (202) 536-1766
Facsimile: (617) 289-0466
Email: spalley@brownrudnick.com

Hayden A. Miller
Brown Rudnick, LLP
7 Times Square,
New York, NY 10036
Phone: (212) 209-4826
Facsimile: (212) 938-2849
Email: hmiller@brownrudnick.com

Attorneys for Claimants Anti Capital (Upper
Cayman), and Anti Capital Asia Ltd.

28