# EXHIBIT D

# Anti Capital Asia Ltd.

**THIS AGREEMENT** (the "**Agreement**") is made effective as of May 18, 2023 (the "**Effective Date**") by and between Anti Capital Asia Ltd, a Taiwan business company ("**Anti Capital**"), and Bluefin Labs Inc. Company Number: 2053019, OMC Chambers, Wickhams Cay 1, Road Town Tortola, British Virgin Islands. ("**Customer**"). Each of Anti Capital and Customer may be referred to herein as a "Party", and together, the "Parties".

**WHEREAS,** Anti Capital advises on strategies for fostering and maintaining liquidity in certain markets for digital assets across different centralized and decentralized exchanges and provides market-making services to implement such strategies (the "**Services**"); and

**WHEREAS,** Customer desires to engage Anti Capital to engage in discretionary trading to increase liquidity in certain markets, identified below, on Customer's Bluefin decentralized exchange (the "**Exchange**").

**NOW, THEREFORE,** in consideration of the promises and the mutual covenants, terms and conditions hereinafter set forth, and for other good and valuable consideration, receipt of which is specifically acknowledged, the parties hereto hereby agree as follows:

## Section 1. APPOINTMENT OF ANTI CAPITAL

1. <u>Market Operations & Trading</u>. Anti Capital will use commercially reasonable efforts to engage in the provision of Services for the following asset pairs and markets on the Exchange:

   a. BTC/USDT perpetual;
   b. ETH/USDT perpetual;
   c. SOL/USDT perpetual;
   d. ARB/USDT perpetual;

2. <u>Trading Capital</u>. To ensure the quality of the Services provided by Anti Capital, Customer shall provide Anti Capital trading capital (the "**Capital Deposit**") in the following amounts:
   i. 200,000 USDC

3. <u>Profits and Risk of Loss</u>. Anti Capital shall be entitled to 25% of any net increase in the Capital Deposit, as determined at 5 P.M. Eastern Time (U.S.) on the Termination Date or such other date on which this Agreement terminates pursuant to Section 3 below. Any such amounts due Anti Capital shall be automatically deducted from the Capital Deposit. However, Anti Capital does not guarantee that any profits will be generated by its Services provided hereunder. Customer acknowledges and agrees that Customer bears

the entire risk of loss associated with Anti Capital's provision of Services, and that the Capital Deposit may be lost in its entirety during the ordinary course of Anti Capital's provision of such Services. Customer agrees to hold Anti Capital harmless for any losses to the Capital Deposit incurred during the good-faith exercise of Anti Capital's efforts to provide the Services described herein.

4. Trading Fees. Any and all applicable fees, including but not limited to gas fees and any other fees incurred by Anti Capital in connection with its Services and trading activity in connection with the Services contemplated hereunder (collectively, "**Trading Fees**") shall be automatically deducted from the Capital Deposit.

## Section 2. SERVICE FEE

For Services rendered hereunder, Customer shall pay Anti Capital a service fee of $48,000 ("**Service Fee**").  Customer shall pay the Service Fee to Anti Capital within two (2) business days of the Effective Date.

## Section 3. TERM & TERMINATION

This Agreement will commence on the Effective Date and will continue for ninety (90) days, following which time it will terminate ("**Termination Date**"). If Customer is five (5) days late or more in making payment of the Service Fee, Anti Capital will have the right to immediately terminate this Agreement by providing Customer written notice of such intent, with reservation of all rights; Anti Capital may waive its right to terminate the Agreement by simply accepting payment.

## Section 4. CONFIDENTIALITY

a. Use of Confidential Information. The Parties, from time to time, may disclose Confidential Information (as defined below) to one another. Accordingly, each Party agrees as the recipient (the "**Receiving Party**") to keep strictly confidential all Confidential Information
provided by the other party (the "**Disclosing Party**"). The Receiving Party further agrees to use the Confidential Information of the Disclosing Party solely for the purposes of enforcing its existing rights and fulfilling its obligations under this Agreement. The Receiving Party may not use for its own benefit or otherwise disclose any of the Confidential Information of the Disclosing Party for any other purpose. The Receiving Party may only disclose the Confidential Information to such employees, directors and officers (collectively, "Representatives") who need to know the Confidential Information solely for the purposes of assisting the Receiving Party in enforcing its existing rights and fulfilling its obligations under this Agreement. The Receiving Party shall be liable for any breach of this Section 4 by its Representatives.

b. <u>Definition of Confidential Information.</u> "Confidential Information" means information in any form, oral, graphic, written, electronic, machine-readable or hard copy consisting of (i) any non-public information provided by the Disclosing Party, including but not limited to, all of its inventions, designs, data, source and object code, program interfaces, know-how, trade secrets, techniques, ideas, discoveries, marketing and business plans, pricing, profit margins, and/or similar information or (ii) any information which the Disclosing Party identifies as confidential information or the Receiving Party should understand from the context of the disclosure, to be confidential information.  Confidential Information also includes this Agreement, its terms, and the fact of its existence.

Confidential Information will not include any information that: (a) is or becomes part of the public domain through no fault of the Receiving Party; (b) was rightfully in Receiving Party's possession at the time of disclosure, without restriction as to use or disclosure; or (c) Receiving Party rightfully receives from a third party who has the right to disclose it and who provides it without restriction as to use or disclosure.

c. <u>Time Limitations</u>. The provisions of this Section 4 will remain in force and effect for one year after the Expiration Date.

d.    Required Disclosure. If a Receiving Party or any of their Representatives is requested to disclose any Confidential Information in connection with any legal or administrative proceeding or investigation, or is required by law, regulation, stock exchange or regulatory authority to disclose any Confidential Information, such person or entity will (a) promptly notify the Disclosing Party of the existence, terms and circumstances surrounding such a request or requirement (unless prohibited by law, regulation or order of a court or administrative tribunal) so that the Disclosing Party may seek a protective order or other appropriate remedy, or waive compliance with the provisions of this Agreement and (b) if, in the absence of a protective order, such disclosure is required in the opinion of such person's or entity's legal counsel, such person or entity may make such disclosure without liability under this Agreement, provided that such person or entity (i) only furnishes that portion of the Confidential Information which is legally required, (ii) gives the Disclosing Party notice of the information to be disclosed as far in advance of its disclosure as practicable (unless prohibited by law, regulation or order of a court or administrative tribunal) and (iii) upon the Disclosing Party's request and at the Disclosing Party's expense, cooperate in any efforts by the Disclosing Party to ensure that confidential treatment shall be accorded to such disclosed information.

e.    Return of Confidential Information. Upon the earlier of (a) termination or expiry of this Agreement and (b) receipt of a notice from the Disclosing Party to the Receiving Party, the Receiving Party shall (i) at the Receiving Party's election, either destroy or return to the Disclosing Party all Confidential Information furnished by the Disclosing Party which is in tangible or electronic form, including any copies which the Receiving Party or their

Representatives have made and (b) certify to the Disclosing Party, in writing, that the Receiving Party has done the foregoing. Any Confidential Information that is not returned or destroyed, including, without limitation, any oral Confidential Information, will remain subject to the confidentiality obligations set forth in this Agreement.

f.    The Receiving Party understands and agrees that monetary damages would not be a sufficient remedy for any breach of Section 4 by the Receiving Party or their Representatives and that, in addition to all other remedies, the Disclosing Party shall be entitled to specific performance or injunctive or other equitable relief as a remedy for any such breach.

## Section 5. REPRESENTATIONS AND WARRANTIES

a. Mutual Representations & Warranties. Each Party represents, warrants and covenants to the other Party that:
        i) It has the requisite power and authority to conduct its business;
        ii) It has duly executed and delivered this Agreement; and
        iii) This Agreement constitutes a valid and legally binding obligation of such Party, enforceable in accordance with its terms.

## Section 6. LIMITATION ON LIABILITY

Customer agrees and acknowledges that Anti Capital is not responsible for the performance of Customer's Exchange. Anti Capital's Services are limited to those set forth in Section 1, Paragraph 1 above. Customer agrees to hold Anti Capital harmless for any losses related to the performance of Customer's Exchange, including but not limited to a hacking incident, technical failure, or security breach experienced by the Exchange.

In no event will Anti Capital be liable to Customer or any other party for any incidental, indirect, consequential, special, exemplary, or punitive damages or losses of any kind (including revenues or profits) arising from or relating to this Agreement, regardless of whether Customer was advised, had other reason to know, or in fact knew of the possibility thereof.  In no event shall Anti Capital's aggregate liability for direct damages under this Agreement exceed the aggregate amount paid by Customer to Anti Capital under this Agreement.

## Section 7. INDEMNIFICATION

Customer will defend, indemnify and hold harmless Anti Capital and its affiliates (and each of their employees, shareholders, directors and representatives) for any penalty, claim or loss to the extent any such penalty, loss or claim that arises based on (a) any applicable regulator deeming the Exchange to be a regulated instrument, including but not limited to a securities exchange, in any jurisdiction, (b) any other applicable government entity, in any jurisdiction, deeming the Exchange or Customer to be unlawful or non-compliant in any capacity, or (c) the performance of Customer's Exchange.

### Section 8. GOVERNING LAW AND ARBITRATION

This Agreement will be governed by and construed in accordance with the laws of the State of Delaware, United States, without giving effect to that body of laws pertaining to conflict of laws. Except as provided below, any dispute arising out of or relating to this Agreement and its formation, breach, performance, interpretation and application, shall be referred to and finally resolved by individual arbitration, and not by class or collective arbitration, in New York, New York by a panel of one (1) arbitrator in accordance with the JAMS Comprehensive Rules and Procedures ("**JAMS Rules**") for the time being in force which rules are deemed to be incorporated by reference to this clause. English shall be the official language for the arbitration. The arbitrator shall be appointed jointly by both parties and if the parties cannot agree on the identity of the arbitrator within thirty (30) days of the parties' mutual decision to refer the matter to arbitration, the arbitrator is to be designated by JAMS in accordance with JAMS Rules. The award rendered by the arbitrator shall be final and binding on the parties, and judgment thereon may be entered in any court having competent jurisdiction. Notwithstanding anything to the contrary in this Section, neither party will be required to arbitrate any dispute relating to actual or threatened unauthorized disclosure of Confidential Information. Either party will be entitled to seek in a court of competent jurisdiction injunctive relief preventing the disclosure of Confidential Information in breach of the terms of Section 4 hereof, or an order for specific performance to compel the other party to perform its obligation under this Agreement.

### Section 9. ENTIRE AGREEMENT

This Agreement supersedes and cancels any and all prior agreements between the parties hereto, express or implied, relating to the subject matter hereof, with the exception of any agreement signed contemporaneous hereto. This Agreement sets forth the entire agreement between the parties hereto. It may not be changed, altered, modified or amended except in a writing signed by both parties.

### Section 10. NON-WAIVER

The failure or refusal of either party to insist upon the strict performance of any provision of this Agreement or to exercise any right in any one or more instances or circumstances will not be construed as a waiver or relinquishment of such provision or right.

### Section 11. ASSIGNMENT/NON-ASSIGNMENT

Neither Party will assign this Agreement, in whole or in part, without the prior written consent of the other Party provided that a Party may assign this Agreement to a purchaser of all or substantially all of its assets without consent of the other Party. This Agreement will inure to the benefit of, and be binding upon the Parties hereto, together with their respective legal representatives, successors, and assigns, as permitted herein.

### Section 12. SEVERABILITY

If any paragraph, term or provision of this Agreement will be held or determined to be unenforceable, the balance of this Agreement will nevertheless continue in full force and effect unaffected by such holding or determination to the fullest extent permitted by law as though

such paragraph, term or provision had been written in such a manner and to such an extent as to be enforceable under the circumstances.

## Section 13. NOTICE

All notices hereunder will be in writing. Notices may be delivered by email to max@anticapital.ai and powen@anticapitla.ai for Anti Capital, and rabeel@bluefin.io for Customer. Either party may designate a new address for purposes of this Agreement by notice to the other party in accordance with this paragraph.

## Section 14. CAPTIONS

The Section captions and headings are merely for ease of reference and will not be read into the meaning of the covenants hereunder. This Agreement is the product of arm's length negotiation between the Parties and as such may not be resolved against the drafter.

## Section 15. SIGNATURES AND COUNTERPARTS

This Agreement may be executed in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument. Counterparts may be delivered via facsimile, electronic mail (including .pdf or any electronic signature complying with the U.S. federal ESIGN Act of 2000, e.g., www.docusign.com) or other transmission method and any counterpart so delivered shall be deemed to have been duly and validly delivered and be valid and effective for all purposes.

[*Signature page follows*]

IN WITNESS WHEREOF, the parties have executed this Agreement as of the Effective Date.

**ANTI CAPITAL ASIA**

**CUSTOMER:**
**BLUEFIN LABS INC.**

By: *Powen Perng*
— 59A2F451B3D2422...

By: *Jonathan Ip*
— 44F087191BB3452...

Name: Powen Perng

Name:    Jonathan Ip

Title:  Director

Title:    Authorized Signatory on behalf of Firefly Foundation Ltd., in its capacity as Director

Date: 5/19/2023

Date: 5/20/2023

Email:  powen@anticapital.ai

Email:    Jonathan@firefly.foundation