# EXHIBIT J

**JAMS COMPREHENSIVE ARBITRATION RULES AND PROCEDURES**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -  X
                                                                     :
In the Matter of an Arbitration Between                              :
                                                                     :
ANTI CAPITAL (UPPER CAYMAN) and                                      :
ANTI CAPITAL ASIA LTD.,                                              :
                                                                     :
                                                                     :
                                                                     :   **OPPOSITION TO**
                         Claimants,                                  :   **BLUEFIN LABS INC.'S**
                                                                     :   **MOTION TO DISMISS**
          and                                                        :
                                                                     :
BLUEFIN LABS INC.,                                                   :
                                                                     :
                                                                     :
                                                                     :
                                                                     :
                         Respondent.                                 :
                                                                     :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -  X

**CLAIMANTS ANTI CAPITAL (UPPER CAYMAN) AND ANTI CAPITAL ASIA LTD.'S
OPPOSITION TO RESPONDENT BLUEFIN LABS INC.'S MOTION TO DISMISS**

## TABLE OF CONTENTS

INTRODUCTION ...........................................................................................................................1

BACKGROUND ...........................................................................................................................2

LEGAL STANDARD....................................................................................................................5

ARGUMENT .................................................................................................................................6

I.      THIS DISPUTE "ARISES OUT OF OR RELATES TO" THE SERVICES
AGREEMENT. ....................................................................................................................6

          A.     The Services Agreement Requires JAMS Arbitration........................................... 6

          B.     The Services Agreement Was Extended and Modified Through Subsequent
Communications and Conduct Between the Parties. ............................................... 7

          C.     The Services Agreement, As Modified, Did Not Expire and the MMA's Language
to the Contrary is of No Moment. .......................................................................... 9

          D.     Bluefin's Terms of Use and Citizenship Are Irrelevant to Jurisdiction................ 11

II.     ANTI CAPITAL'S TORT AND FRAUD CLAIMS ARE ALSO GOVERNED BY THE
SERVICES AGREEMENT, AS MODIFIED, AND ARE THEREFORE SUBJECT TO
ITS ARBITRATION CLAUSE...........................................................................................13

III.    ANTI CAPITAL'S BREACH OF CONTRACT CLAIMS AS TO THE LOAN
AGREEMENT AND MMA ARE ARBITRABLE BEFORE JAMS. ..............................15

CONCLUSION............................................................................................................................17

CERTIFICATE OF SERVICE ...................................................................................................19

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re Coinmint, LLC*,
　261 A.3d 867 (Del. Ch. 2021)...................................................................................................8

*CPC Mikawaya Holdings, LLC v. MyMo Intermediate, Inc.*,
　No. CV 2021-0707-MTZ, 2022 WL 2348080 (Del. Ch. June 29, 2022) .................................9

*Detroit Med. Ctr. v. Provider Healthnet Servs., Inc.*,
　269 F. Supp. 2d 487 (D. Del. 2003)...................................................................................14, 16

*Highlands Wellmont Health Network, Inc. v. John Deere Health Plan*,
　350 F.3d 568 (6th Cir. 2003) .................................................................................................14

*Parfi Holding v. Mirror Image Internet, Inc.*,
　817 A.2d 149 (Del. 2002) .......................................................................................................14

*Pepsi-Cola Bottling Co. of Asbury Park v. Pepsico, Inc.*,
　297 A.2d 28 (Del. 1972) ...........................................................................................................8

*Safer v. Nelson Fin. Grp, Inc.*,
　422 F.3d 289 (5th Cir. 2005) ..................................................................................................16

*Sarissa Cap. Domestic Fund LP v. Innoviva, Inc.*,
　No. CV 2017-0309-JRS, 2017 WL 6209597 (Del. Ch. Dec. 8, 2017) .....................................7

*Sweet Dreams Unlimited, Inc. v. Dial-A-Mattress Int'l, Ltd.*,
　1 F.3d 639 (7th Cir. 1993) ...............................................................................................10, 14

*Symbiont.io, Inc. v. Ipreo Holdings, LLC*,
　No. CV 2019-0407-JTL, 2021 WL 3575709 (Del. Ch. Aug. 13, 2021)....................................9

*Welborn Clinic v. MedQuist, Inc.*,
　301 F.3d 634 (7th Cir. 2002) ..................................................................................................14

*Westendorf v. Gateway 2000, Inc.*,
　No. 16913, 2000 WL 307369 (Del. Ch. Mar. 16, 2000), *aff'd*, 763 A.2d 92
　(Del. 2000) ..............................................................................................................................16

**Other Authorities**

JAMS Rule 9...........................................................................................................................1, 5

JAMS Rule 9(c) ..........................................................................................................................5

ii

JAMS Rule 9(d) ..........................................................................................................................1

JAMS Rule 11 ............................................................................................................................5

JAMS Rule 11(a) .......................................................................................................................5

JAMS Rule 11(b) ....................................................................................................................5, 6

JAMS Rule 29............................................................................................................................5, 17

JAMS Rule 31(c) .......................................................................................................................17

iii

Claimants Anti Capital (Upper Cayman) and Anti Capital Asia Ltd. (collectively, "Anti Capital"), by and through its undersigned counsel, respectfully submits this Opposition in response to Respondent Bluefin Labs Inc.'s ("Bluefin") Motion to Dismiss ("Motion"), pursuant to Rule 9 of the JAMS Comprehensive Arbitration Rules and Procedures ("JAMS Rules").[1]

**<u>INTRODUCTION</u>**

This Arbitration and Motion arise from Bluefin's refusal to keep its promises under a contract (the "Services Agreement"). Bluefin promised Anti Capital significant future token compensation and that any dispute would be resolved by JAMS. After it received the benefit of Anti Capital's services, Bluefin refused to pay. After Anti Capital invoked its rights, Bluefin refused to arbitrate or even confer regarding potential arbitrators.

Now, Bluefin claims this action should be dismissed because "the Services Agreement has *nothing* to do with Anti Capital's claims." (Motion at 6 (emphasis added).) Not so. All roads in this case lead to the Services Agreement. From May 2023 to December 2024, the parties regularly communicated and agreed that Anti Capital would implement high trading volume strategies, and other services, to the benefit of Bluefin's trading platform and governance token launch. These market-making services are common in the cryptocurrency industry as they provide needed liquidity to crypto markets, much as market makers do in "traditional" financial markets. The parties also agreed that Bluefin would compensate Anti Capital, in part, through the award of Blue tokens. Without the Services Agreement, as modified in written communications, Anti Capital would not have provided these services, nor would Bluefin have benefited from them.

---

[1] JAMS Rule 9(d) provides that "[w]ithin fourteen (14) calendar days of service of a counterclaim, a Claimant may submit to JAMS and serve on other Parties a response to such counterclaim and any affirmative defenses, including jurisdictional challenges, it may have." (JAMS Rule 9(d).) Since there is no JAMS Rule specifically addressing the time to file an opposition to a premature dispositive motion, Anti Capital operates under the 14-day deadline prescribed for addressing counterclaims and jurisdictional challenges made in the ordinary course.

The Loan Agreement and Mutual Modification Agreement ("MMA") were ancillary to the Services Agreement.  The parties entered into the Loan Agreement in anticipation of, and to entreat Anti Capital to, execute the *Services Agreement*.  The MMA was implemented to address Bluefin's tardiness in launching the Blue token that would be used to compensate Anti Capital under the *Services Agreement*.  As such, none of the parties' decisions, actions, or other contractual arrangements can be said to be independent of the formation, execution, or amendment of the *Services Agreement*.

Under the Services Agreement, the parties are required to arbitrate before JAMS "any dispute arising out of or relating to this Agreement and its formation, breach, performance, interpretation and application . . . ."  (Demand, Ex. A at Section 8.)  The broad scope of this provision reflects the parties' clear intent to resolve *any* legal disagreement touching upon this contract.  This includes all of the claims asserted in this action.

Bluefin's attempt to escape the arbitration clause fails for three main reasons.  *First*, the parties' oral agreements reflect that the Services Agreement's arbitration clause remains in force today and governs Anti Capital's claims arising directly from that contract.  *Second*, the language of the arbitration clause "arising out of or relating to" is sufficiently broad so as to encompass Anti Capital's tort and fraud claims.  *Third*, Anti Capital's breach of contract claims as to the Loan Agreement and MMA are also properly subject to JAMS arbitration, as these contracts are interrelated and further the same goal as the Services Agreement.  As set forth in greater detail below, the Motion must be denied and the parties' dispute must be arbitrated before JAMS.

## BACKGROUND

Anti Capital is a premier boutique trading firm that provides liquidity and market-making solutions for both institutional clients and early-stage companies.  (Demand ¶ 4.)  Bluefin is one such early-stage company that operates an exchange platform, Bluefin Exchange, and offers its

own governance token, the Blue token. (*Id.* ¶¶ 12-13.) To facilitate the success of Bluefin's platform and token launch, the parties entered into several agreements, pursuant to which Anti Capital would provide certain trading services to Bluefin in exchange for fee and incentive-based compensation (*i.e.*, revenue generated from trading services above a certain amount).

On May 9, 2023, the parties executed the Loan Agreement, under which Bluefin would advance Anti Capital a loan of 100,000 USDC (ERC20) without interest, to be repaid on May 15, 2024. (*Id.* ¶ 18 & Ex. B.) Anti Capital and Bluefin agreed to the terms of the Loan Agreement to facilitate their anticipated contract for trading services, *i.e.*, the Services Agreement. (*Id.* ¶ 18.) This interest-free loan was also intended to be a separate inducement for Anti Capital to trade on the Bluefin Exchange. (*Id.*)

Then, on May 18, 2023, the parties entered into the Services Agreement. (*Id.* ¶ 15 & Ex. A.) Under the original terms of this contract, Anti Capital was engaged to provide advice "on strategies for fostering and maintaining liquidity in certain markets for digital assets across different centralized and decentralized exchanges" and "market-making services to implement such strategies . . . ." (*Id.* ¶ 15.) In return, Anti Capital would receive a service fee, trading fees, and a success fee tied to 25% of any net increase in the so-called "Capital Deposit"—200,000 USDC given to Anti Capital to engage in discretionary trading. (*Id.* ¶ 16.) Importantly, the Services Agreement specified that any dispute "arising out of or relating to" the agreement would be arbitrated in New York, New York by a JAMS arbitrator in accordance with JAMS Rules. (*Id.* ¶ 7.) The original termination date of the Services Agreement was August 16, 2023. (*Id.* ¶ 16.)

Ten days later, on May 29, 2023, the parties modified the structure of the Services Agreement through written communications. (*Id.* ¶¶ 20-25.) The parties agreed that Anti Capital would provide additional and different services for a longer duration. (*Id.*) The parties also agreed

to change Anti Capital's compensation. (*Id.*) Anti Capital was initially entitled to receive net revenue resulting from its trading positions. (*Id.* ¶ 16.) As modified, Bluefin promised to compensate Anti Capital with future digital tokens (*i.e.*, Blue tokens). (*Id.* ¶¶ 20-25.) Bluefin also promised that these tokens would vest upon the token's launch. (*Id.* ¶¶ 22-23.) The parties subsequently made several other modifications to the Services Agreement, including on June 13, 2023, to increase Anti Capital's compensation amount. (*See, e.g.*, *id.* ¶ 26.) However, none of these modifications impacted the Services Agreement's arbitration clause.

On May 24, 2024, the parties entered into the MMA to extend the maturity date on the Loan Agreement. (*Id.* ¶ 32 & Ex. C.) The MMA does not purport to modify the Services Agreement, much less terminate the services that Anti Capital had been providing to Bluefin. It does, however, reflect the continuing viability of the Services Agreement, as it reflects the parties' understanding that Anti Capital would receive token-based compensation for its services. (*Id.*) After executing the MMA, Anti Capital continued to provide additional services to Bluefin for over half a year.

Bluefin's governance token was launched on December 11, 2024—over a year after the originally forecasted date. (*Id.* ¶¶ 13, 24.) Under the parties' contractual arrangements, this launch was supposed to trigger Anti Capital's receipt of Blue tokens as compensation for its market-making services. (*Id.* ¶ 42.) But Anti Capital did not receive a single token.

On January 2, 2025, Bluefin informed Anti Capital that it would not receive the Blue tokens per the agreed-upon schedule and demanded that Anti Capital immediately return its trading capital or else forfeit its rewards. (*Id.* ¶¶ 43-44.) On January 6 and 16, 2025, Anti Capital responded to Bluefin, explaining that Anti Capital was entitled to receive its Blue tokens and the failure to tender this consideration as agreed would give rise to liability. (*Id.* ¶ 48.) Nevertheless, Bluefin refused

4

to pay what was promised.

On April 7, 2025, Anti Capital filed its Demand against Bluefin, alleging claims for breach of contract, conversion, and fraudulent inducement, as well as alternative claims for quantum meruit, breach of implied covenant of good faith and fair dealing, and unjust enrichment. (*Id.* ¶¶ 50-99.)  In connection with these claims, Anti Capital seeks approximately $5,000,000, pre-judgment and post-judgment interest, costs and expenses, specific performance, and a declaration that Bluefin is not entitled to repayment due to its material breach. (*Id.*, Wherefore clause.)

Two weeks later, on April 21, 2025, Bluefin filed the instant Motion, arguing that JAMS and this Arbitrator lack the proper jurisdiction over Anti Capital's claims based on the "clear language" of the contracts.[2]  (Motion at 1.)  To support its request, Bluefin advances three main arguments:  (1) the Services Agreement expired and does not govern the parties' relationship, (2) Anti Capital's claims do not arise from the Services Agreement, and (3) Bluefin did not agree to JAMS arbitration of claims relating to the Loan Agreement or Mutual Modified Agreement, or any claims brought by Anti Capital (Upper Cayman). (*See generally id.*)  As discussed below, each argument is without merit.

## LEGAL STANDARD

Under JAMS Rule 11(b), "[j]urisdictional and arbitrability disputes, including disputes over the formation, existence, validity, interpretation or scope of the agreement under which Arbitration is sought, and who are proper Parties to the Arbitration, shall be submitted to and ruled

---

[2] As an initial matter, Bluefin's Motion is procedurally improper and premature.  Rule 11 provides that any jurisdictional challenges should occur after an Arbitrator has been appointed. (*See* JAMS Rule 11(a)-(b).)  Moreover, Rule 9 indicates that such challenges should be made as part of Bluefin's response to the Demand.  (*See* JAMS Rule 9(c).)  Here, no Arbitrator had yet been appointed at the time Bluefin filed its Motion and Bluefin has not filed any response to the Demand.  Given Bluefin's failure to abide by JAMS Rules, Anti Capital respectfully requests that Bluefin be precluded from asserting any counterclaims, pursuant to JAMS Rule 29.

5

on by the Arbitrator" and "[t]he Arbitrator has the authority to determine jurisdiction and arbitrability issues as a preliminary matter." (JAMS Rule 11(b).)

**ARGUMENT**

**I.    THIS DISPUTE "ARISES OUT OF OR RELATES TO" THE SERVICES AGREEMENT.**

In support of its Motion, Bluefin argues that the Services Agreement expired and does not govern the parties' relationship. (See Motion at 5.) This argument fails because (1) the Services Agreement plainly requires JAMS arbitration for all disputes "arising out of or relating to" the agreement, which encompasses all of Anti Capital's claims, (2) the Services Agreement was extended and modified and so neither the contract nor its arbitration clause expired, (3) the MMA had no legal impact on the expiration date of the Services Agreement and, in fact, evidences the parties' understanding that the Services Agreement, as modified, continued to remain in full force, and (4) Bluefin's Terms of Use and citizenship are irrelevant at this procedural posture.

**A.    The Services Agreement Requires JAMS Arbitration.**

The Services Agreement controls and calls for arbitration through JAMS, stating in relevant part that:

> [A]ny dispute arising out of or relating to this Agreement and its formation, breach, performance, interpretation and application, shall be referred to and finally resolved by individual arbitration, and not by class or collective arbitration, in New York, New York by a panel of one (1) arbitrator in accordance with the JAMS Comprehensive Rules and Procedures ("JAMS Rules") for the time being in force which rules are deemed to be incorporated by reference to this clause.

(Demand, Ex. A at Section 8.) This language is purposefully broad, reflecting the parties' unmistakable intent to arbitrate disagreements arising out of this business relationship. As such, it is beyond dispute that Anti Capital's breach of contract claim premised on the performance of the Services Agreement "aris[es] out of or relate to" that contract.

6

**B.    The Services Agreement Was Extended and Modified Through Subsequent Communications and Conduct Between the Parties.**

In an attempt to circumvent this arbitration clause, Bluefin argues that the Services Agreement expired and therefore its terms do not govern the parties' relationship.  (*See* Motion at 5.)  This argument fails because the Services Agreement was modified and extended through undisputed written communications between Bluefin and Anti Capital.

The parties' original contract—the Services Agreement dated May 18, 2023—is governed by Delaware state law.  (*See* Demand, Ex. A at Section 8 ("This Agreement will be governed by and construed in accordance with the laws of the State of Delaware . . . .").)  Under Delaware law, where an oral agreement "meets the requisites of a valid contract, it will bind the parties the same as a written [] agreement."  *Sarissa Cap. Domestic Fund LP v. Innoviva, Inc.*, No. CV 2017-0309-JRS, 2017 WL 6209597, at *21 (Del. Ch. Dec. 8, 2017) (citation omitted).  "A valid contract exists when (1) the parties have made a bargain with 'sufficiently definite' terms; and (2) the parties have manifested mutual assent to be bound by that bargain."  *Id.* (citation omitted).

Here, Anti Capital and Bluefin's communications postdating the execution of the Services Agreement demonstrate that the parties intended to—and did—modify both the services, duration, and payment provisions of the agreement.  For example, on May 29, 2023, Bluefin contacted Anti Capital to offer to modify the parties' payment arrangement under the Services Agreement:

> In terms of what that looks like operationally - does it make sense for Anti Capital to receive all of the rewards (no profit sharing of them) but the tokens are first used to cover loses in trading capital and then all of the rewards thereafter belong fully to Anti Capital?

(Exhibit 1 (Excerpts of Communications Between Anti Capital and Bluefin) at 2, attached hereto.)  Anti Capital assented to this modification, stating, "Sure, makes sense to me."  (*Id.*)  In the same conversation, Anti Capital asked Bluefin, "And trade and earn reward will be in USDC?" to which Bluefin responded, "They're in points that convert to tokens at TGE [*i.e.*, the Token Generation

Event] in ~2 months[.]" (*Id.*)  As a result of the promised compensation, Anti Capital agreed to provide the new trading strategies requested by Bluefin.  This promised payment is what Anti Capital seeks to recover through this action.

The parties also modified the services that Anti Capital was providing.  The original agreement contemplated that Anti Capital would focus on generating volume for "asset pairs," *i.e.*, derivatives.  (*See* Demand, Ex. A at Section 1(1)(a).)  However, as reflected in the subsequent communications, Bluefin expanded the scope of services and would direct Anti Capital to trade in many other assets.  (*See* Demand ¶ 26; Ex. 1 at 3 ("Hey Max, how are we looking to start scaling out to the 2-3M range for BTC and ETH?").)  Anti Capital agreed to provide these modified services.  (*See id.*)  As consideration for executing the requested trading strategy, Bluefin offered Anti Capital additional lucrative rewards:  "Btw on the maker volume side – we're happy to give your team a 1 bps token rebate on all maker volume (I believe there's $80M so far) until the MM program goes live[.]"  (Ex. 1 at 3.)  Again, Anti Capital agreed:  "Thanks a lot[.]"  (*Id.*)  Apparent in these agreements is a bargain with definite terms—the provision of market-making services for tokens—and Anti Capital and Bluefin's mutual assent to those terms.  These are the services for which Anti Capital seeks to recover through this action.

These modifications are valid despite the Services Agreement's "Entire Agreement" provision.  (*See* Demand, Ex. A at Section 9.)  Delaware law provides that an integrated contract may be modified by subsequent written communications, oral communications, or course of conduct.  *See, e.g.*, *In re Coinmint, LLC*, 261 A.3d 867, 897 (Del. Ch. 2021) ("[I]ntegration clauses . . . do nothing to prevent the Court's consideration of *subsequent* promises, communications, or modifications to the express agreement . . . ." (emphasis added)); *accord Pepsi-Cola Bottling Co. of Asbury Park v. Pepsico, Inc.*, 297 A.2d 28, 33 (Del. 1972) ("The prohibition against amendment

8

except by written change may be waived or modified . . . ." (collecting cases)).  Similarly, Delaware courts have also routinely recognized that "contract provisions deeming oral modifications unenforceable can be waived orally or by a course of conduct just like any other contractual provision." *CPC Mikawaya Holdings, LLC v. MyMo Intermediate, Inc.*, No. CV 2021-0707-MTZ, 2022 WL 2348080, at *13 (Del. Ch. June 29, 2022) (collecting cases) (rejecting defendant's argument that plaintiff's breach of contract claim should be dismissed because the claim hinged on a subsequent oral modification to a contract that contained a "no-oral-modification provision"); *see also Symbiont.io, Inc. v. Ipreo Holdings, LLC*, No. CV 2019-0407-JTL, 2021 WL 3575709, at *52 (Del. Ch. Aug. 13, 2021) (holding entire agreement provision non-dispositive because "contract provisions deeming oral modifications unenforceable can be waived orally or by a course of conduct just like any other contractual provision" (citations omitted)).  That is exactly what happened here.  Several years of communications, countless hours of work, and significant expenditure of cash by Anti Capital prove that the parties agreed to modify the Services Agreement and waived the "Entire Agreement" provision.

C.    **The Services Agreement, As Modified, Did Not Expire and the MMA's Language to the Contrary is of No Moment.**

Bluefin does not dispute that Anti Capital provided services through the end of 2024 or that it made written promises to Anti Capital about its token compensation for such services.  Instead, Bluefin seeks to erase its obligations by pointing to a single sentence in the preamble of the MMA.  (*See, e.g.*, Motion at 4, 5.)  That sentence states: "WHEREAS, Anti Capital Asia and Customer were parties to a services agreement dated effective May 18, 2023 (the "May 18 Agreement") which as of the date hereof has expired[.]"  (*Id.* at 4.)  This argument fails because the Services Agreement did not expire, the MMA did not purport to modify the Services Agreement, and, in any event, the duty to arbitrate in JAMS would survive any expiration.

9

*First*, the MMA does not purport to alter any aspect of the Services Agreement or any subsequent related oral modifications thereto. In fact, the MMA specifically states that the parties intend only to "modify certain terms of the *Loan Agreement*." (Demand, Ex. C at 1 (emphasis added).) The "WHEREAS" clause therefore has no legal impact on the Services Agreement. More importantly, nowhere does the MMA purport to alter the governing law dictating the proper forum for disputes arising out of or relating to the Services Agreement, modified or not.

*Second*, as discussed above, the Services Agreement did not expire. Rather, both parties agreed through their subsequent communications and conduct to extend and modify the Services Agreement to account for changing circumstances *at the behest of Bluefin. See supra* Section I.B. These modifications had no effect on the Services Agreement's "Governing Law and Arbitration" section. As such, the JAMS arbitration provision remained unchanged. Even assuming *arguendo* that the Services Agreement did expire (it did not), its termination would have no impact on the longevity of the arbitration clause. *See, e.g.*, *Sweet Dreams Unlimited, Inc. v. Dial-A-Mattress Int'l, Ltd.*, 1 F.3d 639, 643 (7th Cir. 1993) (rejecting argument that the arbitration provision is "inapposite because the Agreement has expired" because "[i]f the parties had wished to limit the duty to arbitrate to the term of the Agreement itself they could have said so explicitly").

*Third*, a throwaway sentence in the preamble of the MMA drafted by lawyers does not reflect the reality of the parties' commercial relationship. All parties understood that the Services Agreement continued to survive after the execution of the MMA, as confirmed by the parties' actions *after* the execution of the MMA. Anti Capital at all times continued to perform services for Bluefin. (*See* Demand ¶¶ 25-30.) A fact that would make no sense if there was an understanding that the Services Agreement expired. Likewise, the parties continued to communicate about Anti Capital's services and compensation after entering the MMA, such as

when Bluefin confirmed the vesting schedule of Anti Capital's promised tokens and Anti Capital's continued trading volume.  For example, on December 11, 2024, Anti Capital sent a message to inform Bluefin that "for [the] last 48 hours, our trading volume has been increased 1.5-2.0x of 10M per day on Bluefin[.]"  (Ex. 1 at 4.)  Bluefin acknowledged Anti Capital's trading volume, commenting, "I see that from Dec 3rd to Dec 10th you have done 35M and from Dec 10th-11th you've done around 17M in volume!"  (*Id.*)  Anti Capital responded, in part, "Yes 17M in 24 hours[.] Our target is 10M per day on average . . . [,]" and Bluefin acknowledged this response with an "OK" emoji.  (*Id.*)

*Fourth and finally*, the MMA itself reflects the parties' joint understanding that the parties' written modifications to the Services Agreement were and continued to be binding.  As described above, the parties modified the Services Agreement to compensate Anti Capital with future Blue tokens rather than trading net revenue and fees.  The MMA acknowledges that the form of consideration had been modified, as it specifically discusses "BLUE [tokens being] unlocked and received [by] Anti Capital and Anti Capital Asia" on "the date that is one month following the BLUE token […] Token Genesis Event ('*TGE*')" and "on the date that is two months following the TGE[.]"  (Demand, Ex. C at Section 1.2 (a)-(b).)  The MMA also explicitly dictates that "Anti Capital will keep all Bluefin points or BLUE tokens earned through its trading accounts" and that Bluefin "shall deliver 143,132 BLUE tokens to Anti Capital Asia one month following TGE."  (*Id.* at Sections 1.3, 1.4.)  Critically, these provisions would not reference Anti Capital's receipt of Blue tokens had the parties not modified the Services Agreement to include this term.

### D.    Bluefin's Terms of Use and Citizenship Are Irrelevant to Jurisdiction.

As a last-ditch effort to avoid JAMS arbitration, Bluefin argues that its website's Terms of Use require disputes regarding Blue tokens to be arbitrated before the British Virgin Islands ("BVI") International Arbitration Centre.  (*See* Motion at 7.)  This argument makes no sense.

Anti Capital is not, through this action, alleging that Bluefin violated its Terms of Use.  Instead, Anti Capital's *contractual* claims are governed by the parties' specific *contract*, *i.e.*, the Services Agreement.  The Demand does not reference Bluefin's customer obligations under the Terms of Use at all.  Bluefin cannot rewrite the Demand to suit its own theories and divest JAMS of jurisdiction.

Bluefin's argument that the Terms of Use supersede the Services Agreement fares no better.  The Services Agreement deals with the specific contractual relationship that the parties negotiated at length and is not overwritten by "browsewrap" terms of use linked at the bottom of Bluefin's website in obscured and tiny font.  To reach the opposite conclusion would yield absurd results, *i.e.*, a company could avoid its contractual obligations with third parties by publishing boilerplate terms of use on its website in which it renounces all previous vows.

At most, Bluefin's argument regarding the Terms of Use is a prelude to a merits-based affirmative defense—one that requires Bluefin to prove that these Terms were in effect at the relevant time and that Anti Capital agreed to and is subject to these Terms.  But Bluefin has made no such showing, nor could it.  In fact, Bluefin has failed to even tender evidence of the very Terms of Use provision it relies upon, *i.e.*, Section 17.  (*Id.*)  Bluefin purports to attach as Exhibit A to its Motion the Terms of Use, but this exhibit contains no Section 17.  (*Id.*)  The hyperlink provided to the Terms of Use also fails to contain any Section 17.  (*Id.*)  Clearly, Bluefin's argument, which is buried toward the end of its Motion, is not a serious one.

Bluefin's argument premised on citizenship is equally frivolous.  Bluefin claims that its status as a BVI company and its restriction on US citizens' use of the platform somehow divests JAMS of its jurisdiction.  (*See* Motion at 7.)  As JAMS is well aware, foreign entities can and do frequently choose JAMS for dispute resolution, irrespective of any independent US nexus.  Thus,

12

Bluefin's assertion that it has no ties to the United States is irrelevant. Still, here, it is worth noting that Bluefin's co-founder, Rabeel Jawaid, *resides in New York, New York*[3]—one of JAMS' flagship locations. Query whether Mr. Jawaid agreed to JAMS arbitration in New York per the Services Agreement out of personal geographical convenience. Regardless, Bluefin's argument is of no moment because parties may freely contract to resolve disputes before a specific forum, *as evidenced by Anti Capital and Bluefin's contractual agreement to arbitrate before JAMS*.

In sum, it is deeply unclear why Bluefin cites to its Terms of Use (at all), much less provisions that (seemingly) do not exist, or why it exhorts JAMS to be considerate of its BVI citizenship (when its founder lives in New York). Regardless, Bluefin's arguments in support of dismissal should be rejected wholesale.

## II. ANTI CAPITAL'S TORT AND FRAUD CLAIMS ARE ALSO GOVERNED BY THE SERVICES AGREEMENT, AS MODIFIED, AND ARE THEREFORE SUBJECT TO ITS ARBITRATION CLAUSE.

Anti Capital also asserts claims for Quantum Meruit (Fourth Claim), Breach of Implied Covenant of Good Faith and Fair Dealing (Fifth Claim), Conversion (Sixth Claim), Unjust Enrichment (Seventh Claim), and Fraudulent Inducement (Eighth Claim), all of which sound in tort or fraud. (*See* Demand ¶¶ 70-99.) Like Anti Capital's breach of contract claim, these allegations arise out of and relate to the Services Agreement. Thus, these tort and fraud claims are subject to JAMS arbitration and should not be dismissed.

When the arbitrability of claims is disputed,[4] Delaware courts engage in a two-part inquiry,

---

[3] Mr. Jawaid lists his location on his LinkedIn page as New York, New York, United States. *See* Rabeel Jawaid (n.d.). [LinkedIn page]. LinkedIn. Retrieved May 5, 2025, from https://www.linkedin.com/in/rabeel/.

[4] Notably, Bluefin makes no explicit mention of these tort claims in its Motion, nor do any of its arguments directly address their arbitrability. As such, Bluefin apparently concedes that no other barrier exists to the application of the JAMS arbitration clause apart from its erroneous and unsupportable claim that the Services Agreement expired.

as articulated by the Supreme Court of Delaware in *Parfi Holding AB v. Mirror Image Internet, Inc.*, 817 A.2d 149 (Del. 2002). First, courts assess "whether the arbitration clause is broad or narrow in scope." *Id.* at 155. Next, courts apply "the relevant scope of the provision to the asserted legal claim to determine whether the claim falls within the scope of the contractual provisions that require arbitration." *Id.* Generally, Delaware courts have "found that the 'arising out of or relating to this Agreement' language is indicative of a broad arbitration provision." *Detroit Med. Ctr. v. Provider Healthnet Servs., Inc.*, 269 F. Supp. 2d 487, 492 (D. Del. 2003) (collecting cases). Where the scope is determined to be broad, deference is given "to arbitration on *any issues that touch on* contract rights or contract performance." *Parfi Holding AB*, 817 A.2d at 155 (emphasis added).

Numerous federal courts have found that arbitration provisions using the "arising out of or relating to" formulation are broad enough to reach tort and fraud claims related to a contract. *See, e.g.*, *Highlands Wellmont Health Network, Inc. v. John Deere Health Plan*, 350 F.3d 568, 578 (6th Cir. 2003) (concluding that an arbitration clause containing the phrase "'arising out of' is broad enough to include a claim of fraudulent inducement of a contract"); *Welborn Clinic v. MedQuist, Inc.*, 301 F.3d 634, 639 (7th Cir. 2002) (opining that where the arbitration clause contains "arising out of" or "relating to" language, courts "have naturally been willing to read these admittedly expansive clauses quite broadly to include all manner of claims tangentially related to the agreement, including claims of fraud, misrepresentation, and other torts involving both contract formation and performance" and declining to extend this reading to the narrow clause at issue (citation omitted)); *accord. Sweet Dreams Unlimited, Inc.*, 1 F.3d at 642 (holding "that 'arising out of' reaches all disputes having their origin or genesis in the contract, whether or not they implicate interpretation or performance of the contract per se" (emphasis in original)).

Here, the parties agreed to litigate all claims "arising out of or relating to" the Services

14

Agreement before JAMS. This is the broadest standard arbitration provision and evidences the parties' intent to arbitrate before JAMS any claim that could bear some connection to the Services Agreement, including related tort and fraud claims. Anti Capital's tort and fraud claims all hinge on two basic facts: (1) Bluefin received and benefited from Anti Capital's services and (2) Anti Capital expected to receive consideration for these services in the form of Blue tokens but did not. These benefits and expectations would not exist without the parties' oral agreement to modify the Services Agreement to that effect. As such, Anti Capital's tort and fraud claims can easily be said to "touch on," "tangentially relate[] to," or have their "genesis in" the performance of or rights under the Services Agreement. Moreover, none of these claims arise out of or relate to the MMA. Nor are they governed by the Loan Agreement or Bluefin's general Terms of Use. Accordingly, this Arbitrator has a firm basis to conclude that these claims are subject to JAMS arbitration.

### III.    ANTI CAPITAL'S BREACH OF CONTRACT CLAIMS AS TO THE LOAN AGREEMENT AND MMA ARE ARBITRABLE BEFORE JAMS.

As set forth in the Demand, Anti Capital alleges that Bluefin breached the May 9, 2023 Loan Agreement by demanding repayment without furnishing "Anti Capital with approximately 6,537,439.54 Blue tokens before calling in any loan obligations" and, therefore, Anti Capital is relieved of its obligation to repay Bluefin under that contract. (Demand ¶¶ 56-62.) As to the MMA, Anti Capital further (and relatedly) alleges that Bluefin was required to pay Anti Capital "6,537,439.54 million Blue tokens for services rendered between May 2023 and December 2024 prior to any loan repayment" but "refused" to do so, thereby relieving Anti Capital of its obligation to repay Bluefin pursuant to the MMA. (*Id.* ¶¶ 63-69.) While these two breach of contract claims relate to terms of the Loan Agreement and the MMA, the foundation for these allegations is the Services Agreement.

15

With little legal analysis, Bluefin argues that these claims must be dismissed because the Loan Agreement's forum selection clause specifies the BVI.[5]  (*See* Motion at 8.)  Bluefin's argument is misguided and ignores salient legal principles.

"When evaluating the effect of an arbitration clause that is present in only one agreement of a series of related agreements, courts have examined 'the totality of circumstances,' while also recognizing the policy concerns favoring arbitration."  *Westendorf v. Gateway 2000, Inc.*, No. 16913, 2000 WL 307369, at *5 (Del. Ch. Mar. 16, 2000) (collecting cases), *aff'd*, 763 A.2d 92 (Del. 2000).  Courts have concluded that an agreement's arbitration clause can apply to claims arising out of another contract where both are part of the same "overall transaction."  *See, e.g.*, *Detroit Med. Ctr.*, 269 F. Supp. 2d at 493 ("[B]ased on the broad arbitration provision in the Services Agreement and the fact that the agreements were executed contemporaneously as part of the same transaction, the Court concludes that the Services Agreement's arbitration provision applies to claims arising under the Asset Agreement because such claims clearly 'relate to' the Services Agreement."); *accord. Safer v. Nelson Fin. Grp, Inc.*, 422 F.3d 289, 296 (5th Cir. 2005) ("This court has repeatedly found that when agreements are interdependent and exist to further a single goal, an arbitration clause in one of the agreements reaches all aspects of the parties' relationship, including disputes that might arise out of the other agreement." (cleaned up)).  While the facts of cases like *Detroit Medical Center* may not exactly mirror those in this matter, the underlying principle still holds true.  The Services Agreement (original and as modified), the Loan Agreement, and the MMA are part of the same overall transaction and were executed to further the same purpose.  This purpose—Anti Capital providing Bluefin with market-making services in

---

[5] Briefly, Bluefin argues that because the Services Agreement is only between Bluefin and Anti Capital Asia Ltd., all claims involving Anti Capital (Upper Cayman) must be dismissed for lack of jurisdiction. (*See* Motion at 8.)  The Arbitrator should reject this claim for the same reasons articulated *supra* Section III.

16

exchange for compensation—touches on all parts of the parties' relationship. Thus, the Services Agreement's arbitration clause properly governs the forum selection of these contract claims.

Moreover, as a matter of practicality and common sense, the Arbitrator should exercise its authority to determine that claims arising out of the same nexus of facts should be arbitrated together. The Loan Agreement and MMA dictating the proper forum for resolving Anti Capital's claims would be akin to the proverbial tail wagging the dog, as neither of those loan contracts would exist without the Services Agreement. In light of these considerations, the Arbitrator should conclude that Anti Capital's breach of contract claims related to the Loan Agreement and MMA are subject to JAMS arbitration.

## CONCLUSION

For the foregoing reasons, Anti Capital urges this Arbitrator to see Bluefin's actions for what they are: an attempt to take advantage of Anti Capital and avoid making good on its promises. Bluefin should not be able to game the system, yet again. Accordingly, this Arbitrator should deny Bluefin's Motion to Dismiss—including its request for fees and costs[6]—and proceed with the arbitration of all Anti Capital's claims.

Dated: May 5, 2025                                    BROWN RUDNICK LLP

                                                     */s/ Stephen D. Palley*
                                                     Stephen D. Palley, Esq.
                                                     BROWN RUDNICK LLP
                                                     1900 N Street NW, 4th Floor
                                                     Washington, DC 20036
                                                     Phone: (202) 536-1766
                                                     Facsimile: (617) 289-0466

---

[6] Without citing any supporting authority, Bluefin urges the Arbitrator to award Bluefin its fees and costs associated with this Arbitration. (*See* Motion at 8-9.) Under JAMS Rules, there is no fee shifting; the parties are jointly and severally liable for all arbitration costs. (*See* JAMS Rule 31(c).) A party to arbitration may only bear the burden of its opposing party's fees and costs where that party is sanctioned under JAMS Rule 29. No such sanctions have been requested or imposed, nor could they be.

17

Email: spalley@brownrudnick.com

Hayden A. Miller, Esq.
BROWN RUDNICK LLP
7 Times Square
New York, NY 10036
Phone: (212) 209-4826
Facsimile: (212) 938-2849
Email: hmiller@brownrudnick.com

Natasha M. Ertzbischoff, Esq.
BROWN RUDNICK LLP
7 Times Square
New York, NY 10036
Phone: (212) 209-4981
Facsimile: (212) 938-2981
Email: nertzbischoff@brownrudnick.com

*Attorneys for Anti Capital (Upper Cayman)*
*and Anti Capital Asia Ltd.*

18

**CERTIFICATE OF SERVICE**

I, Hayden Miller, certify that on May 5, 2025, I caused a true and correct copy of the foregoing document to be served via electronic service on JAMS Access and electronic mail to counsel for Respondent as follows:

Brian M. Johnson
DICKINSON WRIGHT PLLC
300 West Vine Street, Suite 1700
Lexington, Kentucky 40507
Telephone: (859) 899-8704
Facsimile: (844) 670-6009
bjohnson@dickinsonwright.com
COUNSEL FOR RESPONDENT,
BLUEFIN LABS INC.

*/s/ Hayden Miller*
Hayden Miller, Esq.

19