# EXHIBIT M

| | | |
|---|---|---|
| **IN THE MATTER OF:** | **)** | **ORDER 3: ORDER ON RESPONDENT'S MOTION TO DISMISS** |
| | **)** | |
| **ANTI CAPITAL (UPPER CAYMAN) and ANTI CAPITAL ASIA LTD.** | | |
| | **)** | |
| **Claimants,** | **)** | |
| | **)** | |
| **v.** | **)** | **CASE NO. 5425003755** |
| | **)** | |
| **BLUEFIN LABS, INC.** | **)** | |
| | **)** | |
| | **)** | |
| | **)** | |
| | **)** | |
| | **)** | |
| | **)** | |
| **Respondent.** | | |

## 1. INTRODUCTION

This matter arises under the JAMS Comprehensive Arbitration Rules and Procedures and involves a dispute between Claimants, Anti Capital (Upper Cayman) and Anti Capital Asia Ltd. (collectively, "Anti Capital"), and Respondent, Bluefin Labs Inc. ("Bluefin"). Claimants allege that Bluefin failed to deliver cryptocurrency tokens, referred to as "Blue tokens," as compensation for trading services they performed at Bluefin's request. The Demand for Arbitration invokes the arbitration clause in a Services Agreement executed between Anti Capital Asia and Bluefin on May 18, 2023, and references two other agreements: a Loan Agreement dated May 9, 2023, and a Mutual Modification Agreement ("MMA") dated May 24, 2024.

1

Bluefin moves to dismiss the arbitration in its entirety, arguing that the Services Agreement expired and was superseded by the Loan Agreement and the MMA, neither of which includes an arbitration clause. Bluefin further contends that the asserted claims arise solely from these later agreements, and that Anti Capital (Upper Cayman), a non-signatory to the Services Agreement, lacks standing to enforce its arbitration clause.

Claimants oppose the motion. They assert that the Services Agreement remained operative through continued performance and mutual modification, and that the asserted claims arise directly from obligations originally established under that agreement. They argue that the arbitration clause remains binding and applies broadly to the asserted contractual and non-contractual claims.

The issue for determination is whether this arbitration may proceed under the arbitration clause in the Services Agreement or whether it must be dismissed for lack of jurisdiction.

## 2. PROCEDURAL HISTORY AND BACKGROUND TO THE DISPUTE

### A. Background to the Dispute

The parties' relationship originated in 2023, when Bluefin, a decentralized trading platform, engaged Anti Capital to provide market-making and liquidity services to support the launch and growth of Bluefin's exchange. The relationship was initially governed by two agreements: a Loan Agreement dated May 9, 2023,

under which Bluefin advanced 100,000 USDC to Anti Capital (Upper Cayman), and a Services Agreement dated May 18, 2023, executed between Bluefin and Anti Capital Asia. The Services Agreement included a 90-day term and contained a broad arbitration clause requiring resolution of disputes before JAMS.

Claimants allege that, despite the term expiration, they continued to perform trading and liquidity services at Bluefin's request well into 2024. During this period, the parties allegedly modified the compensation structure to include distribution of Blue tokens following a Token Generation Event ("TGE"). Claimants contend that their trading efforts materially contributed to Bluefin's market visibility and token value. After the TGE in December 2024, Bluefin allegedly refused to deliver the promised tokens.

In May 2024, the parties entered into the MMA. While Bluefin asserts that the MMA superseded the Services Agreement and governs the parties' obligations, Claimants argue the MMA addressed only repayment timing and did not replace the continuing service arrangement, which they claim remained governed by the Services Agreement as modified by conduct.

**B. Procedural History**

On April 7, 2025, Claimants filed a Demand for Arbitration with JAMS, invoking the arbitration clause in the Services Agreement. The Demand alleged that Bluefin failed to deliver Blue tokens as compensation for services rendered and asserted claims for breach of contract, breach of the implied covenant of good faith

3

and fair dealing, fraudulent inducement, conversion, unjust enrichment, and quantum meruit. Claimants sought damages exceeding $5 million and requested declaratory and equitable relief.

On April 21, 2025, Bluefin filed a Motion to Dismiss the arbitration under JAMS Rules 9 and 11, contending that the claims were not subject to arbitration. Bluefin argued that the Services Agreement had expired and been replaced by the MMA and the Loan Agreement, neither of which includes an arbitration clause. Bluefin also challenged Anti Capital (Upper Cayman)'s standing to compel arbitration as a non-signatory to the Services Agreement.

On May 5, 2025, Claimants filed their opposition. They maintained that the Services Agreement remained in effect through mutual performance and had not been replaced. They submitted documentary evidence, including communications in which Bluefin acknowledged the ongoing services, continued trading directives, and a compensation structure consistent with the terms of the Services Agreement.

The Arbitrator was appointed on April 24, 2025, and held the initial case management conference on June 26, 2025. In anticipation of the pending Motion to Dismiss and to promote procedural efficiency, the Arbitrator directed the parties to submit their proposed scheduling input in advance of the conference. During the conference, the Arbitrator addressed the Motion to Dismiss and concurrently discussed the preliminary schedule with the parties. During the case management conference, the parties indicated that there was no need for an oral argument or an evidentiary hearing. The Arbitrator determined that the issues could be resolved on the written record, and to permit inclusion of further communication asserted to

4

evidence ongoing contractual performance, allowed limited supplemental submissions.

To ensure the matter could proceed without delay should the Motion to Dismiss be denied, the Arbitrator ordered the parties to submit a joint statement identifying any remaining items from the June 12, 2025 agenda by July 2, 2025.

Pursuant to Procedural Order No. 1, Claimants were permitted to file limited supplemental communications by July 7, 2025, solely to support their argument regarding mutual contract modification. Respondent was allowed to file a response limited to those materials by July 10, 2025.

Claimants submitted their supplemental materials on time. Respondent filed its response on July 11, one day late and without leave, and included new legal arguments beyond the authorized scope, and subsequently filed a Motion for Enlargement that same day. Claimants objected to Respondent submissions and moved to strike the filing.

In Procedural Order No. 2, issued July 15, 2025, the Arbitrator found the late filing minimally prejudicial but beyond the permitted scope. The Motion for Enlargement was denied, and Respondent's submission was stricken.

This Award follows.

## 3. SUMMARY OF THE PARTIES' POSITIONS

### I.      Respondent's Position

### (1) Expiration and Supersession of the Services Agreement

Bluefin asserts that the Services Agreement, which had a fixed term of 90 days, terminated by its own language and was never extended through formal amendment or mutual written agreement. Bluefin emphasizes that the MMA expressly states that the Services Agreement "has expired" and further provides that the MMA and Loan Agreement "set forth the entire agreement and understanding between the parties." According to Bluefin, this language demonstrates an unequivocal intention to terminate the Services Agreement and replace it with a new contractual framework that omits any arbitration provision.

Bluefin also notes that neither the MMA nor the Loan Agreement contains an arbitration provision. Both instead reflect a choice of forum in the British Virgin Islands. Bluefin argues that the MMA, which mentions the disputed Blue tokens, supersedes the Services Agreement and cannot be used as a basis to compel arbitration.

**(2) Inapplicability of the Arbitration Clause to the Subject Matter of the Dispute**

Bluefin contends that even if the Services Agreement had not expired, it would still not govern the claims in this arbitration, which center on the alleged failure to deliver Blue tokens. Bluefin points out that the Services Agreement contains no provisions referring to digital token compensation, Blue tokens, or token distribution. Rather, it describes a compensation structure based on trading performance and net increases in a capital deposit.

In contrast, the MMA is the only agreement that addresses Blue tokens at all, and it contains no arbitration clause. Bluefin argues that the claims asserted by Claimants including breach of token delivery obligations arise under the MMA, not the Services Agreement, and therefore cannot be subject to the JAMS arbitration clause found only in the latter.

Additionally, Bluefin invokes its website Terms and Conditions, which it claims Claimants agreed to by participating in the platform. These Terms specify arbitration in the British Virgin Islands (BVI IAC) and prohibit U.S.-based claims, reinforcing Bluefin's position that this dispute must be resolved elsewhere.

**(3) Lack of Standing by Anti Capital (Upper Cayman)**

Bluefin further challenges the standing of Anti Capital (Upper Cayman), asserting that it was not a party to the Services Agreement and cannot rely on it to compel arbitration. According to Bluefin, the Services Agreement was entered into solely between Bluefin and Anti Capital Asia Ltd., and there is no language indicating that the benefits or obligations of that contract were intended to extend to the Cayman entity. Bluefin argues that Anti Capital (Upper Cayman) cannot manufacture standing based on parallel involvement in the Loan Agreement or the MMA, as those documents are separate and do not incorporate the arbitration clause.

Moreover, Bluefin contends that Anti Capital's attempt to proceed jointly under a single arbitration demand masks the reality that one of the two claimants lacks any contractual basis to assert rights under the only agreement containing an

7

arbitration provision. Bluefin asserts that this procedural conflation is improper and independently warrants dismissal of Upper Cayman's claims from the arbitration.

**(4) Legal Standards for Enforceability and Scope of Arbitration Clauses**

In support of its position, Bluefin cites Delaware case law including *Feeley v. NHAOCG, LLC* and *Parfi Holding AB v. Mirror Image Internet, Inc.* to argue that arbitration is a matter of contract and may not be imposed in the absence of a clear, mutual agreement.

Bluefin stresses that courts have routinely refused to compel arbitration of disputes that arise under later or separate agreements which do not contain arbitration provisions, even if the parties had arbitrated prior disputes under earlier agreements. Applying this principle here, Bluefin asserts that the claims brought by Anti Capital, based on token vesting and delivery, have no nexus to the Services Agreement and fall squarely under contracts that provide no basis for arbitration.

**(5) Relief Requested**

Based on the foregoing, Bluefin asks that the arbitration be dismissed in its entirety for lack of jurisdiction. It contends that the absence of a binding arbitration agreement applicable to the present dispute deprives the tribunal of authority to proceed. Bluefin also requests that its costs and attorneys' fees be awarded in connection with its efforts to challenge what it characterizes as an improperly filed arbitration demand.

8

## II.    Claimants' Position

## (1) The Services Agreement Remained in Force Through Mutual Modification and Continued Performance

Claimants assert that the Services Agreement did not expire or terminate, but instead remained in effect through a series of mutually agreed modifications, both oral and written, and through the parties' consistent conduct over the course of more than 18 months. According to Claimants, communications from as early as May 2023 show that Bluefin's principal, Rabeel Jawaid, proposed a revised compensation model under which Anti Capital would receive reward tokens in lieu of profit sharing. Claimants assert that this shift in compensation structure was proposed in writing and accepted by Claimants, who thereafter reoriented their trading activity to match Bluefin's evolving demands.

Claimants further cite extensive written exchanges, including messages dated May 29, 2023, June 13, 2023, and October 2023, where Bluefin unambiguously requested continued performance and proposed specific KPI-based compensation terms tied to token delivery.

In support of this position, Claimants submitted documentary evidence, including Slack messages, which they contend show that both parties acknowledged and acted upon this modified arrangement. These include, according to Claimants, instructions from Bluefin directing Anti Capital to increase trading volume in specific markets (e.g., Bitcoin (BTC) and Ethereum (ETH), commitments to volume

9

thresholds not included in the original agreement, and confirmations that Anti Capital's continued services were essential to Bluefin's token launch strategy.

Claimants also cite communications in which Bluefin expressly extended the duration of the Services Agreement and acknowledged the value of Anti Capital's performance, including comments made as late as December 2024, weeks before the token launch.

Claimants further argue that under Delaware law, a contract of fixed duration may be modified or extended through mutual conduct, especially when performance continues and compensation is adjusted accordingly. On this basis, they contend that such mutual modifications preserved the arbitration clause as part of the operative contract.

**(2) The MMA and Loan Agreement Did Not Supersede the Services Agreement**

Claimants dispute Bluefin's contention that the MMA and Loan Agreement superseded the Services Agreement. They argue that these documents were limited in scope and addressed discrete issues: the MMA related to repayment of capital, while the Loan Agreement addressed early-stage financing. Neither document, they assert, contained integration clauses that explicitly extinguished prior agreements regarding services or arbitration.

In support, Claimants cite contemporaneous communications from May 2024 in which Bluefin expressly acknowledged Anti Capital's continued trading obligations and linked those services to reward tokens to be distributed upon the

10

token generation event ("TGE"). In a message dated May 24, 2024, contemporaneous with the execution of the MMA, Bluefin stated that Anti Capital was expected to "continue trading at the scale it was last month for the next 3 months." Claimants argue that if the Services Agreement had expired or been superseded, such statements would have been unnecessary and inconsistent.

Moreover, Claimants point to post-MMA communications in which Bluefin continued to negotiate trading KPIs and volume commitments with reference to prior terms, never invoking the MMA as the controlling agreement governing compensation or services

**(3) The Arbitration Clause Remains Binding and Encompasses This Dispute**

Claimants argue that the arbitration clause in the Services Agreement continues to govern the relationship and therefore provides a valid basis for JAMS jurisdiction. They emphasize that the arbitration clause was broad, covering "any dispute arising out of or relating to" the agreement. Because Claimants' claims relate directly to services performed under the modified Services Agreement, and the reward tokens allegedly promised as compensation for those services, Claimants assert that the dispute plainly falls within the scope of the arbitration clause.

Claimants reject Bluefin's contention that the dispute arises solely under the MMA, noting that the MMA contains no provisions regarding trading obligations or token distribution, and thus cannot be the source of the present controversy. They

11

further argue that Bluefin's own communications, including statements referencing token-based reward structures and KPI-based amendments, confirm that the parties continued to operate under the Services Agreement as modified, well after the execution of the MMA.

Claimants contend that Bluefin's website Terms and Conditions do not apply because the parties' relationship was governed by negotiated agreements, not by assent to online terms. They argue there is no evidence they agreed to those Terms, and that the JAMS arbitration clause in the Services Agreement remains the operative dispute resolution provision.

**(4) Anti Capital (Upper Cayman) Has Standing to Enforce the Arbitration Clause**

Anti Capital (Upper Cayman) argues it has standing because it actively participated in providing services to Bluefin and was part of the parties' modified agreement to receive compensation in Blue tokens. Though not named in the original Services Agreement, it was clearly involved in the ongoing relationship, which evolved through mutual conduct and written communications. Therefore, its inclusion in the arbitration is proper, and Bluefin's standing objection lacks merit.

**(5) Legal and Evidentiary Support for Arbitration**

12

Claimants cite legal authority supporting their position that arbitration clauses survive mutual modifications and that subsequent agreements do not extinguish arbitration rights absent clear and express intent. They argue that where, as here, the dispute arises from a long course of conduct governed by an original agreement that included arbitration, and where that agreement was never expressly rescinded, courts and arbitrators consistently find that the arbitration clause remains enforceable.

In addition to legal precedent, Claimants submit an extensive evidentiary record of communications and performance history supporting their contention that the modified Services Agreement governed the relationship through 2024, including the disputed token compensation scheme.

Claimants request that the Arbitrator deny Bluefin's Motion to Dismiss in its entirety and confirm that the claims asserted are properly within the jurisdiction of this arbitration.

## 4. APPLICABLE LEGAL STANDARDS

This arbitration is governed by the JAMS Comprehensive Arbitration Rules and Procedures, and Delaware substantive law, as specified in Section 8 of the Services Agreement.

Respondent argues that the Services Agreement no longer governs the parties' relationship and that, instead, subsequent agreements and online Terms and Conditions call for dispute resolution in the British Virgin Islands under BVI

13

law. However, both parties submitted legal arguments grounded in Delaware law and relied extensively on Delaware authority throughout their briefing. Moreover, the Services Agreement expressly provides for Delaware law and JAMS arbitration, and the claims asserted here all arise from the same operative course of performance that began under that agreement.

For purposes of resolving this Motion, including the threshold questions of arbitrability and jurisdiction, the Arbitrator applies Delaware law and the JAMS Rules as contemplated by the Services Agreement and as consistently invoked by both parties in their submissions. This determination is made solely for purposes of resolving arbitrability and does not preclude future argument as to the governing law for the merits, should that remain in dispute.

Rule 11(b) of the JAMS Rules expressly authorizes the Arbitrator to resolve "jurisdictional and arbitrability disputes, including disputes over the formation, existence, validity, interpretation or scope of the agreement under which Arbitration is sought."

Here, the primary legal questions presented by Bluefin's Motion to Dismiss concern the enforceability of the arbitration clause in the Services Agreement, its continued applicability after the agreement's stated expiration, and whether the various claims asserted by Claimants fall within the scope of that clause. These questions are addressed through settled principles of Delaware contract law and arbitration jurisprudence.

14

**A. Arbitrability and Scope of Arbitration Clauses**

Under Delaware law, courts and arbitrators interpret arbitration clauses broadly when they include language such as "arising out of or relating to" the agreement. In *Parfi Holding AB v. Mirror Image Internet, Inc.*, 817 A.2d 149 (Del. 2002), the Delaware Supreme Court made clear that aclaim is considered arbitrable if it "touches on" the contractual relationship, even if it is not strictly based on breach.

Similarly, in *Feeley v. NHAOCG, LLC*, 62 A.3d 649 (Del. Ch. 2012), the Court of Chancery reiterated that parties cannot be compelled to arbitrate in the absence of a clear and binding agreement. However, *Feeley* also affirmed that where an arbitration clause exists, and a claim is reasonably related to the agreement, that claim may fall within the clause's scope even if labeled as a tort or equitable claim.

The arbitration clause in the Services Agreement provides that "[a]ny controversy or claim arising out of or relating to this Agreement or the breach thereof" shall be resolved through binding arbitration before JAMS. This language is virtually identical to the clause interpreted in *Parfi*, and Delaware law construes such clauses expansively.

In this case, the record reflects that the claims asserted, although styled in part as fraud, unjust enrichment, and other tort-based or quasi-contractual theories, arise from the same operative set of facts as the performance obligations originally created by the Services Agreement and extended thereafter.

15

**B. Survival of Arbitration Clauses After Contract Expiration**

Delaware law recognizes that arbitration provisions may survive the expiration of the underlying contract, so long as the dispute arises from the parties' prior contractual relationship or continued performance thereafter. In *Sweet Dreams Unlimited, Inc. v. Dial-A-Mattress Int'l, Ltd.*, 1 F.3d 639 (7th Cir. 1993), a case cited by Claimants, the court rejected the argument that the arbitration clause was "inapposite because the Agreement has expired," reasoning that "if the parties had wished to limit the duty to arbitrate to the term of the Agreement itself they could have said so explicitly." This reasoning has been adopted by courts applying Delaware law in assessing whether the parties intended to preserve contractual obligations, including dispute resolution provisions, beyond the contract's formal expiration.

The central inquiry in these cases is whether the parties continued to act as though the original agreement remained in effect, and whether the dispute is sufficiently related to the original contractual obligations. If so, courts have found that the arbitration clause remains operative despite the nominal expiration of the agreement.

Here, the parties continued performing for over 18 months after the expiration of the original 90-day term of the Services Agreement. Communications submitted by Claimants show that Bluefin not only accepted continued services, but affirmatively directed and benefited from Anti Capital's market-making activity,

16

including volume generation, bot deployment, and capital contributions, often referencing compensation via token rewards or performance milestones.

## C. Arbitrability of Tort and Fraud Claims

Arbitration clauses that include the formulation "arising out of or relating to" are routinely construed by courts and arbitral tribunals to be broad in scope. Such clauses are generally understood to extend beyond claims strictly sounding in contract to encompass tort and equitable claims that are factually or legally connected to the contractual relationship. This includes allegations of fraudulent inducement, misrepresentation, and unjust enrichment where the conduct at issue arises from or bears a substantial relationship to the agreement containing the arbitration clause.

The Sixth Circuit in *Highlands Wellmont Health Network, Inc. v. John Deere Health Plan*, 350 F.3d 568, 578 (6th Cir. 2003) held it had long recognized that arbitration clauses using "arising out of" language are "extremely broad." Agreeing with the reasoning of the Seventh Circuit, the court concluded that a claim asserting a contract is voidable due to fraudulent inducement does arise out of the contract.

In this proceeding, Claimants assert a number of claims beyond breach of contract. These include claims for conversion, unjust enrichment, quantum meruit, and fraudulent inducement. All of these are premised on the same alleged failure by Bluefin to compensate Claimants for trading services performed and capital deployed in reliance on promises allegedly made under and in continuation of the

17

Services Agreement. The Claimants' position is supported by evidence showing that the scope, duration, and compensation structure of the Services Agreement were revised over time and understood by both parties as operative through mid-to-late 2024. Delaware Case law supports that such claims are arbitrable when they arise from or are sufficiently connected to the parties' contractual relationship, and the submissions here support such a connection.

## D. Modifications and Entire Agreement Clauses

Bluefin contends that the Services Agreement was replaced by the Mutual Modification Agreement ("MMA"), which contains no arbitration clause. In response, Claimants invoke Delaware law recognizing that contracts may be modified by later conduct, communications, or mutual agreement, even where the original agreement includes a no-oral-modification clause or an entire-agreement clause.

In *In re Coinmint, LLC*, 261 A.3d 867, 897 (Del. Ch. 2021), the court held that "While integration clauses proscribe the Court's consideration of all oral and written communications and agreements that occurred prior to the agreement when interpreting it, they do nothing to prevent the Court's consideration of subsequent promises, communications, or modifications to the express agreement …".

Delaware courts take a pragmatic approach to contract interpretation and modification. If the parties' conduct indicates that they continued to rely on or modify the terms of the original agreement, including its dispute resolution mechanism, then those terms may continue to govern.

18

For purposes of this motion, the presence of an integration clause in the Services Agreement does not preclude a finding that the agreement remained in effect, particularly where both parties continued to perform under its terms and referred to it in subsequent written communications.

## 5. ANALYSIS AND FINDINGS

The threshold issue before the Arbitrator is whether the claims asserted in this arbitration fall within the scope of a valid and enforceable arbitration agreement. Bluefin contends that the agreement containing the arbitration clause, the May 18, 2023 Services Agreement between Anti Capital Asia Ltd. and Bluefin Labs Inc., expired by its own terms and was later superseded by two other agreements: the May 9, 2023 Loan Agreement and the May 24, 2024 Mutual Modification Agreement ("MMA"), neither of which contains an arbitration clause. Claimants assert that the Services Agreement was not extinguished, but rather continued in force as modified through mutual agreement and conduct, and that the arbitration clause within it continues to apply.

After careful review of the parties' contracts, contemporaneous communications, course of performance, and the applicable legal standards, the Arbitrator concludes that: (1) the Services Agreement remained operative as modified by mutual conduct; (2) its arbitration clause governs the present dispute; and (3) Anti Capital (Upper Cayman), though not a signatory to the Services Agreement, has standing to proceed in this arbitration.

19

**A. Continued Applicability of the Services Agreement and Arbitration Clause**

The Services Agreement was executed on May 18, 2023, between Anti Capital Asia Ltd. and Bluefin Labs Inc. It included a broadly worded arbitration clause requiring final and binding arbitration before JAMS of "any dispute arising out of or relating to this Agreement and its formation, breach, performance, interpretation and application." The agreement specified a 90-day term, with an expiration date of August 16, 2023. Bluefin argues that the passage of time and the execution of the MMA and Loan Agreement conclusively demonstrate that the Services Agreement expired and is no longer in effect.

However, the Arbitrator finds that the parties' conduct after August 2023, indeed, through at least December 2024, demonstrates a continued commercial relationship governed by the terms of the Services Agreement, albeit modified over time. The record includes extensive evidence of communications in which Bluefin directed Anti Capital to continue providing market-making and trading services, often referencing token-based rewards and performance metrics. For example:

- In **May 2023**, shortly after signing the Services Agreement, Bluefin's principal proposed altering the compensation model from a profit-sharing structure to one based on future token rewards, specifically referencing "points that convert to tokens at TGE in 2 months."

20

- In **June and July 2023**, Bluefin continued to direct specific trading strategies and requested higher volumes, including demands to scale trading activity "to the 2-3M range for BTC and ETH," exceeding the original obligations under the written agreement.

- In **October 2023**, Bluefin proposed that Anti Capital continue trading in exchange for trading fee rebates and future token distributions, further evidencing an ongoing and evolving relationship.

- In **May and June 2024**, around the time of the MMA, communications confirm that Anti Capital would "continue trading at scale... for the next 3 months" despite no such obligation being spelled out in the MMA itself.

This sustained course of performance strongly supports a finding that the Services Agreement remained in effect beyond its nominal term. Indeed, even as late as December 2024, Bluefin acknowledged and encouraged Anti Capital's trading performance and sought to extend services in view of its impending token launch.

While Bluefin points to the MMA's recital that the Services Agreement "has expired," the Arbitrator finds that this language is not dispositive. Respondent relies heavily on the integration clause in the MMA and Loan Agreement, which state that they "set forth the entire agreement and understanding between the parties," to argue that the Services Agreement, including its arbitration clause, was

21

extinguished. However, under Delaware law, such boilerplate integration clauses do not automatically negate continued performance or modification of prior agreements when the parties' actions demonstrate otherwise.

As the Delaware Court of Chancery held in *In re Coinmint, LLC*, 261 A.3d 867 (Del. Ch. 2021), an integration clause may be overridden by mutual conduct that materially alters or continues the parties' obligations. Here, the communications and ongoing performance following execution of the MMA show that both parties continued to act in accordance with the modified Services Agreement.

Notably, the MMA itself references terminology from the Services Agreement (e.g., "Capital Deposit") and is silent on the dispute resolution mechanism, suggesting it was not intended as a wholesale replacement. The clause stating that the Services Agreement had "expired" appears solely in a prefatory "whereas" clause, not in any operative provision, and is therefore not determinative.

In context, the integration clause in the MMA must be read narrowly and does not bar the conclusion that the Services Agreement, including its arbitration clause, remained operative through mutual conduct and governed the parties' commercial relationship during the relevant period.

The Respondent's reliance on *Feeley v. NHAOCG, LLC*, 62 A.3d 649 (Del. Ch. 2012), is misplaced. In *Feeley*, the Court of Chancery distinguished between claims that are independent of an agreement and those that are inextricably linked to it, holding that a cause of action is not subject to arbitration only if it "could have been

22

brought had the parties not signed" the contract containing the arbitration clause. Here, by contrast, the claims asserted, whether sounding in contract, tort, or equity, are deeply rooted in the parties' ongoing contractual relationship under the Services Agreement, as modified through performance. The alleged failure to compensate Claimants for services rendered arises directly from obligations originally established and performed under the Services Agreement. As such, these claims are not "independent" under *Feeley* or *Parfi Holding AB v. Mirror Image Internet, Inc.*, 817 A.2d 149 (Del. 2002), but rather fall squarely within the scope of the operative arbitration clause.

Delaware law recognizes that formal contractual modifications can be effected by mutual conduct. In *Sarissa Capital Domestic Fund LP v. Innoviva, Inc.*, 2017 WL 6209597 (Del. Ch. Dec. 8, 2017), and *In re Coinmint, LLC*, 261 A.3d 867 (Del. Ch. 2021), the Delaware Chancery Court held that course-of-performance and mutual conduct may modify or extend the terms of a prior agreement, even if it contains a no-oral-modification clause. The record here reflects numerous instances in which both parties modified key terms of the agreement,compensation structure, duration, trading obligations, without executing a formal written amendment.

Although not necessary to the resolution of this motion, it is relevant to acknowledge certain commercial patterns typical in the digital asset space. In early-stage blockchain projects, formal written agreements often evolve alongside development and launch timelines, with token-based compensation tied to milestones such as a Token Generation Event (TGE). In this context, parties may modify performance and reward structures informally, through iterative

23

communication and ongoing collaboration. The record here reflects precisely that pattern: evolving obligations, adaptive compensation terms, and sustained reliance by both parties on the initial agreement as modified. Such dynamics, while less formal, do not preclude the continued application of the original arbitration clause where the course of dealing demonstrates mutual assent and performance.

In sum, the Arbitrator finds that while the written term of the Services Agreement may have expired on paper, the agreement remained in effect through mutual performance and conduct. The Services Agreement, as modified, governs the parties' commercial relationship during the relevant period, and its arbitration clause remains valid and enforceable.

## B. Scope of the Arbitration Clause

Having found that the arbitration clause remains in force, the next question is whether the claims asserted in this arbitration fall within its scope. The clause applies to any claims "arising out of or relating to" the Services Agreement. Under Delaware law, this language is interpreted broadly. In *Parfi Holding AB v. Mirror Image Internet, Inc.*, 817 A.2d 149 (Del. 2002), the Delaware Supreme Court held that such clauses cover not only contract claims but also tort and quasi-contractual claims that are factually linked to the contract.

Here, Claimants assert claims for breach of contract, breach of the implied covenant of good faith and fair dealing, fraudulent inducement, conversion, unjust enrichment, and quantum meruit. Each of these claims relates to Bluefin's alleged

24

failure to compensate Anti Capital for services rendered, services that were consistently performed under the modified Services Agreement.

While Bluefin attempts to characterize the dispute as one that arises solely from the MMA or the Loan Agreement, neither of which includes an arbitration clause, the factual context belies that claim. The MMA does not govern the parties' performance obligations; it addresses the method and timing of loan repayment and token disbursement, but it does not create a new service arrangement. Nor does it address the bulk of the trading-related services that gave rise to Anti Capital's claims.

Moreover, the MMA itself acknowledges and incorporates prior concepts such as the "Capital Deposit," which originated in the Services Agreement, and establishes repayment triggers tied to trading performance and token launch milestones that were only relevant because of the long-standing agreement regarding services and compensation. In that respect, the MMA is more properly understood as a continuation of the parties' evolving relationship, not a discrete contract for new obligations.

The claims at issue, especially those for breach of contract, conversion, and unjust enrichment, arise directly from the work performed under the Services Agreement and from Bluefin's failure to deliver promised compensation (i.e., Blue tokens) in exchange. As courts have held, where a tort or quasi-contract claim is intertwined with an underlying agreement containing an arbitration clause, the clause governs. See *Detroit Med. Ctr. v. Provider Healthnet Servs., Inc.*, 269 F. Supp. 2d

25

487 (D. Del. 2003); *Sweet Dreams Unlimited, Inc. v. Dial-A-Mattress Int'l, Ltd.*, 1 F.3d 639 (7th Cir. 1993).

Accordingly, the Arbitrator finds that all of the claims asserted in the Demand fall within the scope of the arbitration clause in the Services Agreement.

**C. Standing of Anti Capital (Upper Cayman)**

Respondent also challenges the standing of Anti Capital Upper Cayman to assert claims under the Services Agreement, arguing it was not a party to that contract. Claimants respond that the agreements at issue, including those involving Upper Cayman, are part of a unified commercial relationship governed by the Services Agreement and its arbitration clause. The Arbitrator agrees that, for purposes of arbitrability, the claims brought by Upper Cayman are sufficiently intertwined with the Services Agreement and arise out of the same course of performance. Accordingly, the Arbitrator finds that Upper Cayman's participation in this arbitration is not barred on standing grounds at this stage. The issue of ultimate contractual standing, if disputed, may be revisited as necessary on a fuller record.

In light of the foregoing findings regarding the continued applicability of the Services Agreement and the breadth of its arbitration clause, the Arbitrator finds that all claims asserted in this arbitration, including those referencing the Loan Agreement and the MMA, are properly before this tribunal. Although Respondent contends that certain claims must be resolved in the British Virgin Islands pursuant

26

to forum selection clauses in the Loan Agreement and Terms of Use, those arguments are unavailing here.

The Arbitrator finds that the Services Agreement, as modified through continued performance, governs the parties' ongoing commercial relationship, including the compensation structure involving Blue tokens. The Loan Agreement and MMA are factually and contractually intertwined with the Services Agreement and were executed in furtherance of the same overall transaction. Delaware law permits an arbitration clause in one agreement to extend to related agreements where they form part of a unified relationship. Accordingly, the arbitration clause in the Services Agreement encompasses the breach of contract claims arising under both the Loan Agreement and the MMA, and those claims are arbitrable before JAMS.

The Arbitrator has also considered Bluefin's argument that its website Terms and Conditions require arbitration in the British Virgin Islands and bar U.S.-based claims. However, the Arbitrator finds no basis in the record to conclude that Claimants affirmatively agreed to or relied on those online Terms in forming the contractual relationship at issue. The parties' dealings were governed by negotiated agreements, specifically the Services Agreement, Loan Agreement, and MMA, not by click-through assent to website terms. Moreover, the dispute arises from direct service arrangements and compensation terms negotiated off-platform. As such, Bluefin's Terms and Conditions do not alter the arbitrability analysis or override the binding clause in the Services Agreement.

The scope of this ruling is limited to whether the asserted claims are properly subject to arbitration under the JAMS Rules. As found above, they are.

27

## 6. RULING ON MOTION TO DISMISS

Based on the record, the parties' submissions, the governing contractual documents, and the applicable legal standards, the Arbitrator hereby issues the following Order:

1.      **Respondent's Motion to Dismiss is denied in its entirety.** The Arbitrator finds that a valid and enforceable arbitration agreement exists under the May 18, 2023 Services Agreement. The parties continued to operate under the terms of that agreement through mutual modification and ongoing performance. The claims asserted in the Demand for Arbitration fall within the scope of the agreement's arbitration clause.

2.      **All claims asserted by Claimants Anti Capital (Upper Cayman) and Anti Capital Asia Ltd. shall proceed to arbitration on the merits.** The Arbitrator finds that the claims, including those sounding in contract, tort, and equity, arise out of or relate to the parties' contractual relationship. The arbitration clause in the Services Agreement encompasses these claims. Although Anti Capital (Upper Cayman) was not a signatory to the Services Agreement, its participation in the parties' course of dealing and its execution of the Mutual Modification Agreement support its inclusion at this stage of the proceeding.

3.      **Jurisdictional objections, including any challenge to Claimants' standing, are preserved.** The Arbitrator retains discretion to revisit these matters if the evidentiary record so

28

warrants, including questions concerning Anti Capital (Upper Cayman)'s contractual rights or legal entitlement to relief.

4.    **This arbitration shall proceed in accordance with the JAMS Comprehensive Arbitration Rules and Procedures.**

The parties shall confer within seven (7) calendar days of the date of this Order and submit a proposed revised procedural schedule. If the parties are unable to reach agreement, they shall submit separate proposed schedules by the same deadline, and the Arbitrator will enter a scheduling order accordingly.

5.    **The Arbitrator reserves all rulings on costs and fees.**

Any application for attorneys' fees, costs, or other relief in connection with the Motion to Dismiss may be submitted at the conclusion of the arbitration or at such other time as the Arbitrator may direct, consistent with JAMS Rule 24 and applicable law.

This Order resolves the issues raised in Respondent's Motion to Dismiss. All other claims and defenses remain pending.

**SO ORDERED.**

Dated: July 17, 2025

Signed:    *YPKamminga*

**Peter Kamminga, PhD. Esq.**

Arbitrator

29