# EXHIBIT O

**JAMS COMPREHENSIVE ARBITRATION RULES AND PROCEDURES**

**In the Matter of an Arbitration Between**

**ANTI CAPITAL (UPPER CAYMAN) and**
**ANTI CAPITAL ASIA LTD.,**

     **Claimant(s),**

**and**

**BLUEFIN LABS INC.**

     **Respondent.**

## <u>MOTION FOR LEAVE TO FILE COUNTERCLAIM</u>

Respondent, Bluefin Labs, Inc. ("Bluefin"), by counsel and pursuant to Rule 11 of the JAMS Comprehensive Rules & Procedures, moves the Arbitrator for leave to file the Counterclaim attached hereto as Exhibit A. In support of this motion, Bluefin states that in light of its motion to dismiss, Bluefin could not have filed the proposed Counterclaim within the timeframe permitted by Rule 9(c) without risking a potential waiver of its jurisdictional challenges. Now that the Arbitrator has overruled Bluefin's motion to dismiss, Bluefin should be permitted to file its Counterclaim in order to ensure all claims between the parties are resolved. Claimants are aware of the basis of Bluefin's counterclaim, which is for the recovery of funds loaned to Claimants. In fact, Claimants acknowledged the obligation to repay the funds in their Statement of Claim. *See*, *e.g.*, Statement of Claim ¶ 42. Because discovery is only now commencing and the parties were aware of the issues underlying the Counterclaim before this arbitration was even initiated, Anti Capital would not be unfairly prejudiced if the Arbitrator were to grant leave.

Respectfully submitted,


/s/ Brian M. Johnson
Brian M. Johnson
Logan J. Mayfield
DICKINSON WRIGHT PLLC
300 West Vine Street, Suite 1700
Lexington, Kentucky 40507
Telephone: (859) 899-8704
Facsimile:  (844) 670-6009
bjohnson@dickinsonwright.com
lmayfield@dickinsonwright.com
COUNSEL FOR RESPONDENT,
BLUEFIN LABS INC.

## CERTIFICATE OF SERVICE

I hereby certify that on this 4th day of August, 2025, the foregoing was served on all counsel through the JAMS filing system.


/s/ Brian M. Johnson
COUNSEL FOR RESPONDENT,
BLUEFIN LABS INC.

4901-2027-8873 v1 [113761-2]

2

**JAMS COMPREHENSIVE ARBITRATION RULES AND PROCEDURES**

**In the Matter of an Arbitration Between**

**ANTI CAPITAL (UPPER CAYMAN) and**
**ANTI CAPITAL ASIA LTD.,**

    **Claimant(s),**

**and**

**BLUEFIN LABS INC.**

    **Respondent.**

**BLUEFIN LABS, INC.'S COUNTERCLAIM AGAINST**
**ANTI CAPITAL (UPPER CAYMAN) AND ANTI CAPITAL ASIA LTD.**

Respondent, Bluefin Labs, Inc. ("Bluefin"), by counsel and for its Counterclaim against Anti Capital (Upper Cayman) ("Anti Capital Upper Cayman") and Anti Capital Asia Ltd. ("Anti Capital Asia") (collectively, "Anti Capital"), states as follows:

**BACKGROUND**

1.    On May 9, 2023, Anti Capital Upper Cayman entered into a Loan Agreement with Bluefin.  A copy of the Loan Agreement is attached as Exhibit A.

2.    Pursuant to the Loan Agreement, Bluefin agreed to advance the sum of $100,000 to Anti Capital Upper Cayman.  Loan Agreement, Section 2.1(a).

3.    The Loan Agreement contained a Maturity Date of May 15, 2024 by which all of the remaining indebtedness was required to be repaid by Anti Capital Upper Cayman. Loan Agreement, Section 2.2(a).

4.    On May 18, 2023, Anti Capital Asia entered into a Services Agreement with Bluefin. A copy of the Services Agreement is attached as Exhibit B.

1

5. To ensure the quality of the Services provided by Anti Capital Asia, Bluefin agreed to provide Anti Capital Asia $200,000 in trading capital (the "Capital Deposit"). Services Agreement, Section 1.2.

6. On May 24, 2024, the Loan Agreement was modified through a Mutual Modification Agreement ("MMA") executed by Bluefin, Anti Capital Asia, and Anti Capital Upper Cayman. A copy of the MMA is attached as Exhibit C.

7. Under the terms of the MMA, Anti Capital Asia agreed to return $100,000 of the Capital Deposit set forth in the Services Agreement following execution of the MMA. MMA, Section 1.1.

8. Claimants further agreed to repay the outstanding $100,000 Loan Agreement balance and the remaining $100,000 Capital Deposit either one or two months following Bluefin's BLUE ("BLUE") Token Genesis Event ("TGE"), depending on the aggregate value of the BLUE tokens unlocked and received by Claimants. MMA, Section 1.2(a)-(b).

9. Regardless of the aggregate value of the BLUE tokens unlocked and received by Claimants, however, Claimants agreed to repay the entire balance of the Capital Account and loan amount three months following the TGE. MMA, Section 1.2(c).

10. As Claimants have acknowledged in its Statement of Claim, the TGE occurred on December 11, 2024. Statement of Claim, ¶ 42.

11. Thus, pursuant to the MMA, Claimants were required to repay the remaining balance of the loan amount and Capital Account no later than March 11, 2024. MMA, Section 1.2(c).

12. To date, however, Claimants have not made any payments towards their debt obligations specified in the MMA and Loan Agreement. *See* Statement of Claim, ¶ 46.

## COUNT I
## BREACH OF CONTRACT

13.    Bluefin incorporates the foregoing allegations by reference as if fully set forth herein.

14.    The Loan Agreement and MMA are binding and enforceable contracts.

15.    Bluefin's BLUE TGE occurred on December 11, 2024.

16.    Thus, pursuant to the MMA, Claimants were obligated to repay the entire balance of the Capital Account and loan amount no later than March 11, 2024.

17.    Claimants, however, have failed to make any payment to Bluefin, leaving a balance of $200,000 owed to Bluefin.

18.    Due to Claimants' failure to make payments as required under the MMA, Claimants are in default under the terms of the MMA and Loan Agreement.

19.    As a result of Claimants' breaches and defaults, Bluefin has suffered monetary damages.

WHEREFORE, Bluefin demands the following relief:

i)    Judgment against Claimants for actual and compensatory damages, together with any additional damages the evidence may prove;

ii)    Attorneys' fees, costs and other expenses as provided by applicable law;

iii)    Prejudgment interest; and

iv).    Any and all other relief at law or in equity to which Bluefin may appear entitled.

3

Respectfully submitted,


*/s/ Brian M. Johnson*
Brian M. Johnson
Logan J. Mayfield
DICKINSON WRIGHT PLLC
300 West Vine Street, Suite 1700
Lexington, Kentucky 40507
Telephone: (859) 899-8704
Facsimile:  (844) 670-6009
bjohnson@dickinsonwright.com
lmayfield@dickinsonwright.com
COUNSEL FOR RESPONDENT,
BLUEFIN LABS INC.

## CERTIFICATE OF SERVICE

I hereby certify that on this 4th day of August, 2025, the foregoing was served on all counsel through the JAMS filing system.



*/s/ Brian M. Johnson*
COUNSEL FOR RESPONDENT,
BLUEFIN LABS INC.

4

# EXHIBIT A

**LOAN AGREEMENT**

**THIS LOAN AGREEMENT** is made as of May 9, 2023 between Bluefin Labs Inc. (the "**Lender**"), with primary mailing address and contact information as follows: OMC Chambers, Wickhams Cay 1, Road Town, Tortola, British Virgin Islands, Attention: Jonathan Ip, Email: jonathan@firefly.foundation, and Anti Capital (Upper Cayman) (the "**Borrower**"), with primary mailing address and contact information as follows: Anti Capital 16F, No. 206, Section 1, Keelung Rd, Xinyi District, Taipei City, 110, Taiwan, Attention: Powen Perng, Email: powen@anticapital.ai.

WHEREAS the parties have agreed that, upon and subject to the terms and conditions contained herein, the Lender will advance by way of loan to the Borrower, and the Borrower will borrow, the aggregate sum of the Loan (as defined below);

NOW THEREFORE THIS AGREEMENT WITNESSES that, in consideration of the mutual covenants and agreements contained herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged by each of the parties hereto, the parties hereto hereby covenant and agree as follows:

**ARTICLE 1**
**INTERPRETATION**

**1.1**     **Definitions.** In this Agreement, unless the context otherwise requires, the following words and phrases shall have the meanings set out below, respectively:

(a)     "**Borrower**" has the meaning ascribed thereto in the recitals;

(b)     "**Business Day**" means a day other than a Saturday, Sunday or public holiday and on which banks are open for business in the British Virgin Islands;

(c)     "**Encumbrances**" has the meaning ascribed thereto in Section 3.1(d);

(d)     "**Event of Default**" has the meaning ascribed thereto in Section 5.1;

(e)     "**Lender**" has the meaning ascribed thereto in the recitals;

(f)     "**Loan**" has the meaning ascribed thereto in Section 2.1;

(g)     "**Loan Documents**" means this Agreement and any other documents to be executed and delivered to the Lender by the Borrower;

(h)     "**Maturity Date**" has the meaning ascribed thereto in Section 2.2(a); and

(i)     "**Outstanding Indebtedness**" means the aggregate amount of the Loan, all accrued and unpaid interest hereunder and any other amounts which may from time to time be owing hereunder or pursuant hereto.

**1.2    Rules of Construction.** Except as may be otherwise specifically provided in this Agreement and unless the context otherwise requires, in this Agreement:

(a)    the terms "Agreement", "this Agreement", "the Agreement", "hereto", "hereof", "herein", "hereby", "hereunder" and similar expressions refer to this Agreement in its entirety and not to any particular provision hereof;

(b)    references to an "Article", "Section", "Schedule" or "Exhibit" followed by a number or letter refer to the specified Article or Section of or Schedule or Exhibit to this Agreement;

(c)    the division of this Agreement into articles and sections and the insertion of headings are for convenience of reference only and shall not affect the construction or interpretation of this Agreement;

(d)    words importing the singular number only shall include the plural and vice versa and words importing the use of any gender shall include all genders;

(e)    the word "including" is deemed to mean "including without limitation";

(f)    the terms "party" and "the parties" refer to a party or the parties to this Agreement;

(g)    any reference to this Agreement means this Agreement as amended, modified, replaced or supplemented from time to time;

(h)    any reference to a statute, regulation or rule shall be construed to be a reference thereto as the same may from time to time be amended, re-enacted or replaced, and any reference to a statute shall include any regulations or rules made thereunder;

(i)    all dollar amounts refer to US dollars;

(j)    any time period within which a payment is to be made or any other action is to be taken hereunder shall be calculated excluding the day on which the period commences and including the day on which the period ends; and

(k)    whenever any payment is required to be made, action is required to be taken or period of time is to expire on a day other than a Business Day, such payment shall be made, action shall be taken or period shall expire on the next following Business Day.

**ARTICLE 2**
**LOAN**

**2.1    Loan.**

(a)    The Lender hereby agrees to advance the sum of US$100,000 (the "**Loan**") on May 15, 2023 or such other date as mutually agreed to by the parties as a loan to the Borrower upon and subject to the terms and conditions contained in this Agreement.

(b)    The parties agree that the Loan shall be delivered by the Lender in the form of 100,000 USDC (ERC20) to such digital wallet address designated by the Borrower in writing to the

Lender (the "**Borrower Wallet**"). The Borrower acknowledges and agrees that all risk of loss in respect of such payment shall be borne by the Borrower upon confirmation of the transfer of such payment by the Lender to the Borrower Wallet.

**2.2**    **Repayment of Loan; Prepayment**

**(a)**    All Outstanding Indebtedness shall be paid by the Borrower to the Lender on May 15, 2024 (the "**Maturity Date**") in the form of USDC (ERC20) to such digital wallet address as designated by the Lender.

**(b)**    When not in default under this Agreement and prior to the Maturity Date, the Borrower shall be entitled to prepay all or any portion of the Loan outstanding without notice, bonus or penalty.

**2.3**    **Interest.** Prior to the Maturity Date, no interest shall be payable on the Loan. Following the Maturity Date, interest shall be payable on any amount of the Loan outstanding at any time, and from time to time, and any overdue interest, at 18.99% per annum, calculated and compounded monthly.

**ARTICLE 3**
**REPRESENTATIONS AND WARRANTIES**

**3.1**    **Representations and Warranties of the Borrower.** The Borrower hereby represents and warrants to the Lender as follows, and acknowledges and confirms that the Lender is relying on such representations and warranties in connection with the Loan:

**(a)**    the Borrower has the capacity to enter into the Loan Documents and perform the Borrower's obligations thereunder;

**(b)**    The execution and delivery of the Loan Documents and the performance by the Borrower of its obligations thereunder will not result in the violation of any indenture or other agreement, written or oral, to which the Borrower is a party or by which it is bound;

**(c)**    This Agreement and the other Loan Documents have been duly executed and delivered by the Borrower and constitute legal, valid and binding obligations of the Borrower enforceable against the Borrower in accordance with their respective terms, subject only to any limitation under applicable laws relating to bankruptcy, insolvency, arrangement or creditors' rights generally, and the discretion that a court may exercise in the granting of equitable remedies; and

**(d)**    the property and assets of the Borrower are beneficially owned by it, with good and marketable title thereto, free and clear of any security interests, mortgages, liens, claims, charges or other encumbrances whatsoever (collectively, "**Encumbrances**").

DocuSign Envelope ID: 46E78300-4DA1-41D3-8BB5-64332D13FB22

4

## ARTICLE 4
## COVENANTS

**4.1** **Covenants.** So long as the Loan or any part thereof remains outstanding, the Borrower covenants and agrees with the Lender that the Borrower shall:

(a)  pay or cause to be paid all Outstanding Indebtedness falling due hereunder on the dates and in the manner specified herein; and

(b)  comply in all material respects with the requirements of all applicable law, and all obligations which, if contravened, could give rise to Encumbrances over any of the Borrower's assets, and all contracts to which it is bound, non-compliance with which would, singly or in the aggregate, have a material adverse effect upon its business or upon the ability of the Borrower to perform its obligations under any Loan Document to which it is a party.

## ARTICLE 5
## EVENTS OF DEFAULT

**5.1** **Events of Default.** The occurrence of any of the following events shall constitute a default under this Agreement (each, an "**Event of Default**"):

(a)  default by the Borrower, in payment of any Outstanding Indebtedness to the Lender when due;

(b)  default by the Borrower in the performance or observance of any covenant, condition or obligation contained in any Loan Document to which it is a party;

(c)  any representation or warranty of the Borrower contained in this Agreement or any Loan Document proves to have been untrue in any material respect at the time in respect of which it was made;

(d)  default by the Borrower in the performance or observance of any covenant, condition or obligation contained in any agreement between the Borrower and any person, where such default gives rise to a right to enforce security against the Borrower and such security is being enforced;

(e)  the Borrower takes any action or commences any proceedings or any action or proceeding is taken or commenced by another person or persons against the Borrower in respect of the liquidation or dissolution of the Borrower and same is not contested in good faith by the Borrower;

(f)  the Borrower commits or threatens to commit any act of bankruptcy pursuant to or set out under the provisions of any laws of any jurisdiction;

(g)  the filing of a petition for a receiving order against the Borrower pursuant to the provisions of any laws of any jurisdiction and the same is not contested in good faith by the Borrower;

**(h)**     any execution, sequestration or other process of any court or other tribunal becoming enforceable against the Borrower or a distress or analogous action or proceeding being taken, commenced or issued against the Borrower;

**(i)**     a receiver, receiver and manager, agent liquidator or other similar administrator being appointed in respect of the assets of the Borrower or any part thereof or the taking by a secured party, lien claimant, other encumbrancer, judgment creditor or a person asserting similar rights of possession of the assets of the Borrower or any part thereof and the same is not contested in good faith by the Borrower;

**(j)**     the Borrower transfers, assigns, sells, leases or otherwise disposes of all or any of its assets or any interest in such assets;

**(k)**     any material portion of the Borrower's assets is damaged, lost or destroyed; or

**(l)**     the Lender in good faith believes the prospect of payment of Outstanding Indebtedness or performance of the Borrower's obligations under this Agreement is impaired.

**5.2     Remedies Upon Default.** Upon the occurrence of any Event of Default, the Lender may, in addition to any other rights and remedies available to the Lender:

**(a)**     declare the amount of the Outstanding Indebtedness to be immediately due and payable; and

**(b)**     take such actions and commence such proceedings as may be permitted at law or in equity (whether or not provided for herein or in the Loan Documents) at such times and in such manner as the Lender in its sole discretion may consider expedient.

## ARTICLE 6
## GENERAL PROVISIONS

**6.1     Reliance and Non-Merger.** All covenants, agreements, representations and warranties of the Borrower made herein or in another Loan Document are material, shall be deemed to have been relied upon by the Lender notwithstanding any investigation heretofore or hereafter made by the Lender or any employee or other representative of the Lender and shall survive the execution and delivery of this Agreement and the other Loan Documents until the Borrower shall have satisfied and paid all of the Outstanding Indebtedness.

**6.2     Notices.** Any notice or other communication to be given hereunder to any of the parties hereto shall be in writing and may be given by delivery, or sent by facsimile or other similar means of electronic communication, or if postal services and deliveries are then operating, mailed by registered mail to such party at such party's address set out on the first page of this Agreement or at such other address as such party may have designated by notice so given to the other parties hereto. Any notice or other communication shall be deemed to have been given, if delivered, on the date of delivery, or if sent by facsimile or other similar means of electronic communication, on the Business Day next following the date

of sending, or if mailed by registered mail as aforesaid, on the third Business Day following the date of the mailing if postal service and deliveries are then operating.

**6.3      Governing Law and Submission to Jurisdiction**. This Agreement shall be governed by and construed in accordance with the laws of the British Virgin Islands. For the purpose of legal proceedings this Agreement shall be deemed to have been made in the British Virgin Islands and to be performed there and the courts of the British Virgin Islands shall have jurisdiction over all disputes which may arise under this Agreement and the Borrower hereby irrevocably and unconditionally submit to the exclusive jurisdiction of such courts, provided always that nothing herein contained shall prevent the Lender from proceeding at this election against the Borrower in the Courts of any other province, state, country or jurisdiction.

**6.4      Time of Essence.** Time shall be of the essence of this Agreement.

**6.5      Severability.** If any provision of this Agreement is determined by a court of competent jurisdiction to be invalid, illegal or unenforceable in any respect, all other provisions of this Agreement shall nevertheless remain in full force and effect so long as the economic or legal substance of the transactions contemplated hereby is not affected in any manner materially adverse to any party hereto.

**6.6      Amendments and Waivers.** No amendment or waiver of any provision of this Agreement shall be binding on any party unless consented to in writing by such party.  No waiver of any provision of this Agreement shall constitute a waiver of any other provision, nor shall any waiver of any provision of this Agreement constitute a continuing waiver unless otherwise expressly provided.

**6.7      Assignment.** No party may assign any of its rights or benefits under this Agreement, or delegate any of its duties or obligations, except with the prior written consent of the other parties. Notwithstanding the foregoing, the Lender may assign and transfer all of its rights, benefits and duties and obligations under this Agreement in their entirety, without the consent of the Borrower, to an affiliate or to a purchaser of all or substantially all of the business of the assignor, whereupon the assignee shall be liable for all of the obligations of the assignor under this Agreement and the assignor shall be released from all such obligations.

**6.8      Successors and Assigns.** This Agreement shall enure to the benefit of and shall be binding on and enforceable by and against the parties and their respective successors or heirs, executors, administrators and other legal personal representatives, and permitted assigns.

**6.9      Further Assurances.**  Whether before or after the happening of an Event of Default, the Borrower shall at its own expense do, make execute or deliver, or cause to be done, made executed or delivered by other persons, all such further acts, documents and things in connection with the Loan and the Loan Documents as the Lender may reasonably require from time to time for the purpose of giving effect to the Loan Documents including, without limitation, for the purpose of facilitating the enforcement of the security granted under the Loan Documents, all immediately upon the request of Lender.

**6.10    Counterparts.** This Agreement may be executed in counterparts, each of which when so executed and delivered shall be deemed to be an original and such counterparts together shall constitute one and the same Agreement.

**6.11    Independent Legal Advice.** The parties acknowledge and agree that prior to executing this Agreement that they have had the opportunity to obtain independent legal advice. By signing this

Agreement, each party confirms that they are satisfied with the independent legal advice they have received or hereby waive their entitlement to same.

**[*Remainder of page intentionally left blank. Signature page follows.*]**

IN WITNESS WHEREOF the parties hereto have duly executed this Loan Agreement as of the date first written above.

**LENDER:**

**BLUEFIN LABS INC.**

By: _____

Name: Jonathan Ip

Title: Authroized Signatory, for and on behalf of Firefly Foundation

For and on behalf of the Lender.

**BORROWER:**

**ANTI CAPITAL (UPPER CAYMAN)**

By: _____

Name: Powen Perng

Title: Head of Taiwan

For and on behalf of the Borrower.

# EXHIBIT B

# Anti Capital Asia Ltd.

**THIS AGREEMENT** (the "**Agreement**") is made effective as of May 18, 2023 (the "**Effective Date**") by and between Anti Capital Asia Ltd, a Taiwan business company ("**Anti Capital**"), and Bluefin Labs Inc. Company Number: 2053019, OMC Chambers, Wickhams Cay 1, Road Town Tortola, British Virgin Islands. ("**Customer**"). Each of Anti Capital and Customer may be referred to herein as a "Party", and together, the "Parties".

**WHEREAS,** Anti Capital advises on strategies for fostering and maintaining liquidity in certain markets for digital assets across different centralized and decentralized exchanges and provides market-making services to implement such strategies (the "**Services**"); and

**WHEREAS,** Customer desires to engage Anti Capital to engage in discretionary trading to increase liquidity in certain markets, identified below, on Customer's Bluefin decentralized exchange (the "**Exchange**").

**NOW, THEREFORE,** in consideration of the promises and the mutual covenants, terms and conditions hereinafter set forth, and for other good and valuable consideration, receipt of which is specifically acknowledged, the parties hereto hereby agree as follows:

## Section 1. APPOINTMENT OF ANTI CAPITAL

1. <u>Market Operations & Trading</u>. Anti Capital will use commercially reasonable efforts to engage in the provision of Services for the following asset pairs and markets on the Exchange:

   a. BTC/USDT perpetual;
   b. ETH/USDT perpetual;
   c. SOL/USDT perpetual;
   d. ARB/USDT perpetual;

2. <u>Trading Capital</u>. To ensure the quality of the Services provided by Anti Capital, Customer shall provide Anti Capital trading capital (the "**Capital Deposit**") in the following amounts:
   i. 200,000 USDC

3. <u>Profits and Risk of Loss</u>. Anti Capital shall be entitled to 25% of any net increase in the Capital Deposit, as determined at 5 P.M. Eastern Time (U.S.) on the Termination Date or such other date on which this Agreement terminates pursuant to Section 3 below.  Any such amounts due Anti Capital shall be automatically deducted from the Capital Deposit. However, Anti Capital does not guarantee that any profits will be generated by its Services provided hereunder.  Customer acknowledges and agrees that Customer bears

the entire risk of loss associated with Anti Capital's provision of Services, and that the Capital Deposit may be lost in its entirety during the ordinary course of Anti Capital's provision of such Services. Customer agrees to hold Anti Capital harmless for any losses to the Capital Deposit incurred during the good-faith exercise of Anti Capital's efforts to provide the Services described herein.

4. Trading Fees. Any and all applicable fees, including but not limited to gas fees and any other fees incurred by Anti Capital in connection with its Services and trading activity in connection with the Services contemplated hereunder (collectively, "**Trading Fees**") shall be automatically deducted from the Capital Deposit.

## Section 2. SERVICE FEE

For Services rendered hereunder, Customer shall pay Anti Capital a service fee of $48,000 ("**Service Fee**").  Customer shall pay the Service Fee to Anti Capital within two (2) business days of the Effective Date.

## Section 3. TERM & TERMINATION

This Agreement will commence on the Effective Date and will continue for ninety (90) days, following which time it will terminate ("**Termination Date**"). If Customer is five (5) days late or more in making payment of the Service Fee, Anti Capital will have the right to immediately terminate this Agreement by providing Customer written notice of such intent, with reservation of all rights; Anti Capital may waive its right to terminate the Agreement by simply accepting payment.

## Section 4. CONFIDENTIALITY

a. Use of Confidential Information. The Parties, from time to time, may disclose Confidential Information (as defined below) to one another. Accordingly, each Party agrees as the recipient (the "**Receiving Party**") to keep strictly confidential all Confidential Information
provided by the other party (the "**Disclosing Party**"). The Receiving Party further agrees to use the Confidential Information of the Disclosing Party solely for the purposes of enforcing its existing rights and fulfilling its obligations under this Agreement. The Receiving Party may not use for its own benefit or otherwise disclose any of the Confidential Information of the Disclosing Party for any other purpose. The Receiving Party may only disclose the Confidential Information to such employees, directors and officers (collectively, "Representatives") who need to know the Confidential Information solely for the purposes of assisting the Receiving Party in enforcing its existing rights and fulfilling its obligations under this Agreement. The Receiving Party shall be liable for any breach of this Section 4 by its Representatives.

b. <u>Definition of Confidential Information.</u> "Confidential Information" means information in any form, oral, graphic, written, electronic, machine-readable or hard copy consisting of (i) any non-public information provided by the Disclosing Party, including but not limited to, all of its inventions, designs, data, source and object code, program interfaces, know-how, trade secrets, techniques, ideas, discoveries, marketing and business plans, pricing, profit margins, and/or similar information or (ii) any information which the Disclosing Party identifies as confidential information or the Receiving Party should understand from the context of the disclosure, to be confidential information. Confidential Information also includes this Agreement, its terms, and the fact of its existence.

Confidential Information will not include any information that: (a) is or becomes part of the public domain through no fault of the Receiving Party; (b) was rightfully in Receiving Party's possession at the time of disclosure, without restriction as to use or disclosure; or (c) Receiving Party rightfully receives from a third party who has the right to disclose it and who provides it without restriction as to use or disclosure.

c. <u>Time Limitations</u>. The provisions of this Section 4 will remain in force and effect for one year after the Expiration Date.

d.      Required Disclosure. If a Receiving Party or any of their Representatives is requested to disclose any Confidential Information in connection with any legal or administrative proceeding or investigation, or is required by law, regulation, stock exchange or regulatory authority to disclose any Confidential Information, such person or entity will (a) promptly notify the Disclosing Party of the existence, terms and circumstances surrounding such a request or requirement (unless prohibited by law, regulation or order of a court or administrative tribunal) so that the Disclosing Party may seek a protective order or other appropriate remedy, or waive compliance with the provisions of this Agreement and (b) if, in the absence of a protective order, such disclosure is required in the opinion of such person's or entity's legal counsel, such person or entity may make such disclosure without liability under this Agreement, provided that such person or entity (i) only furnishes that portion of the Confidential Information which is legally required, (ii) gives the Disclosing Party notice of the information to be disclosed as far in advance of its disclosure as practicable (unless prohibited by law, regulation or order of a court or administrative tribunal) and (iii) upon the Disclosing Party's request and at the Disclosing Party's expense, cooperate in any efforts by the Disclosing Party to ensure that confidential treatment shall be accorded to such disclosed information.

e.      Return of Confidential Information. Upon the earlier of (a) termination or expiry of this Agreement and (b) receipt of a notice from the Disclosing Party to the Receiving Party, the Receiving Party shall (i) at the Receiving Party's election, either destroy or return to the Disclosing Party all Confidential Information furnished by the Disclosing Party which is in tangible or electronic form, including any copies which the Receiving Party or their

Representatives have made and (b) certify to the Disclosing Party, in writing, that the Receiving Party has done the foregoing. Any Confidential Information that is not returned or destroyed, including, without limitation, any oral Confidential Information, will remain subject to the confidentiality obligations set forth in this Agreement.

f.      The Receiving Party understands and agrees that monetary damages would not be a sufficient remedy for any breach of Section 4 by the Receiving Party or their Representatives and that, in addition to all other remedies, the Disclosing Party shall be entitled to specific performance or injunctive or other equitable relief as a remedy for any such breach.

## Section 5. REPRESENTATIONS AND WARRANTIES

a. <u>Mutual Representations & Warranties</u>. Each Party represents, warrants and covenants to the other Party that:

i) It has the requisite power and authority to conduct its business;

ii) It has duly executed and delivered this Agreement; and

iii) This Agreement constitutes a valid and legally binding obligation of such Party, enforceable in accordance with its terms.

## Section 6. LIMITATION ON LIABILITY

Customer agrees and acknowledges that Anti Capital is not responsible for the performance of Customer's Exchange. Anti Capital's Services are limited to those set forth in Section 1, Paragraph 1 above. Customer agrees to hold Anti Capital harmless for any losses related to the performance of Customer's Exchange, including but not limited to a hacking incident, technical failure, or security breach experienced by the Exchange.

In no event will Anti Capital be liable to Customer or any other party for any incidental, indirect, consequential, special, exemplary, or punitive damages or losses of any kind (including revenues or profits) arising from or relating to this Agreement, regardless of whether Customer was advised, had other reason to know, or in fact knew of the possibility thereof.  In no event shall Anti Capital's aggregate liability for direct damages under this Agreement exceed the aggregate amount paid by Customer to Anti Capital under this Agreement.

## Section 7. INDEMNIFICATION

Customer will defend, indemnify and hold harmless Anti Capital and its affiliates (and each of their employees, shareholders, directors and representatives) for any penalty, claim or loss to the extent any such penalty, loss or claim that arises based on (a) any applicable regulator deeming the Exchange to be a regulated instrument, including but not limited to a securities exchange, in any jurisdiction, (b) any other applicable government entity, in any jurisdiction, deeming the Exchange or Customer to be unlawful or non-compliant in any capacity, or (c) the performance of Customer's Exchange.

### Section 8. GOVERNING LAW AND ARBITRATION

This Agreement will be governed by and construed in accordance with the laws of the State of Delaware, United States, without giving effect to that body of laws pertaining to conflict of laws. Except as provided below, any dispute arising out of or relating to this Agreement and its formation, breach, performance, interpretation and application, shall be referred to and finally resolved by individual arbitration, and not by class or collective arbitration, in New York, New York by a panel of one (1) arbitrator in accordance with the JAMS Comprehensive Rules and Procedures ("**JAMS Rules**") for the time being in force which rules are deemed to be incorporated by reference to this clause. English shall be the official language for the arbitration. The arbitrator shall be appointed jointly by both parties and if the parties cannot agree on the identity of the arbitrator within thirty (30) days of the parties' mutual decision to refer the matter to arbitration, the arbitrator is to be designated by JAMS in accordance with JAMS Rules. The award rendered by the arbitrator shall be final and binding on the parties, and judgment thereon may be entered in any court having competent jurisdiction. Notwithstanding anything to the contrary in this Section, neither party will be required to arbitrate any dispute relating to actual or threatened unauthorized disclosure of Confidential Information. Either party will be entitled to seek in a court of competent jurisdiction injunctive relief preventing the disclosure of Confidential Information in breach of the terms of Section 4 hereof, or an order for specific performance to compel the other party to perform its obligation under this Agreement.

### Section 9. ENTIRE AGREEMENT

This Agreement supersedes and cancels any and all prior agreements between the parties hereto, express or implied, relating to the subject matter hereof, with the exception of any agreement signed contemporaneous hereto. This Agreement sets forth the entire agreement between the parties hereto. It may not be changed, altered, modified or amended except in a writing signed by both parties.

### Section 10. NON-WAIVER

The failure or refusal of either party to insist upon the strict performance of any provision of this Agreement or to exercise any right in any one or more instances or circumstances will not be construed as a waiver or relinquishment of such provision or right.

### Section 11. ASSIGNMENT/NON-ASSIGNMENT

Neither Party will assign this Agreement, in whole or in part, without the prior written consent of the other Party provided that a Party may assign this Agreement to a purchaser of all or substantially all of its assets without consent of the other Party. This Agreement will inure to the benefit of, and be binding upon the Parties hereto, together with their respective legal representatives, successors, and assigns, as permitted herein.

### Section 12. SEVERABILITY

If any paragraph, term or provision of this Agreement will be held or determined to be unenforceable, the balance of this Agreement will nevertheless continue in full force and effect unaffected by such holding or determination to the fullest extent permitted by law as though

such paragraph, term or provision had been written in such a manner and to such an extent as to be enforceable under the circumstances.

### Section 13. NOTICE

All notices hereunder will be in writing. Notices may be delivered by email to max@anticapital.ai and powen@anticapitla.ai for Anti Capital, and rabeel@bluefin.io for Customer. Either party may designate a new address for purposes of this Agreement by notice to the other party in accordance with this paragraph.

### Section 14. CAPTIONS

The Section captions and headings are merely for ease of reference and will not be read into the meaning of the covenants hereunder. This Agreement is the product of arm's length negotiation between the Parties and as such may not be resolved against the drafter.

### Section 15. SIGNATURES AND COUNTERPARTS

This Agreement may be executed in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.  Counterparts may be delivered via facsimile, electronic mail (including .pdf or any electronic signature complying with the U.S. federal ESIGN Act of 2000, e.g., www.docusign.com) or other transmission method and any counterpart so delivered shall be deemed to have been duly and validly delivered and be valid and effective for all purposes.

[*Signature page follows*]

IN WITNESS WHEREOF, the parties have executed this Agreement as of the Effective Date.

| | |
|---|---|
| **ANTI CAPITAL ASIA** | **CUSTOMER:**<br>**BLUEFIN LABS INC.** |

By: _Powen Perng_ (DocuSigned by) 59A2F451B3D2422...

By: _Jonathan Ip_ (DocuSigned by) 44F087191BB3452...

Name: Powen Perng

Name:    Jonathan Ip

Title:  Director

Title:    Authorized Signatory on behalf of Firefly Foundation Ltd., in its capacity as Director

Date: 5/19/2023

Date: 5/20/2023

Email:  powen@anticapital.ai

Email:    Jonathan@firefly.foundation

# EXHIBIT C

## MUTUAL MODIFICATION AGREEMENT

This Mutual Modification Agreement (the "*Modification*") is effective as of May 24, 2024 (the "*Effective Date*") by and between Anti Capital (Upper Cayman), a Cayman Islands business company ("**Anti Capital**"), Anti Capital Asia Ltd. ("**Anti Capital Asia**") and Bluefin Labs Inc. Company Number: 2053019, OMC Chambers, Wickhams Cay 1, Road Town Tortola, British Virgin Islands ("*Customer*"). Each of Anti Capital and Customer may be referred to herein as a "*party*", and together, the "*parties*".

**WHEREAS**, Anti Capital and Customer are parties to that certain loan agreement, effective May 9, 2023 (the "*Loan Agreement*");

**WHEREAS,** Anti Capital Asia and Customer were parties to a services agreement dated effective May 18, 2023 (the "*May 18 Agreement*") which as of the date hereof has expired;

**WHEREAS**, the parties now mutually wish to modify certain terms of the Loan Agreement. Unless specifically addressed herein, no other provisions of the Loan Agreement are intended to be modified hereby;

**WHEREAS**, all capitalized terms used herein and not otherwise defined in this Modification shall have the same meanings as in the Loan Agreement;

**NOW, THEREFORE**, in consideration of the mutual promises and obligations contained herein, and for other good and valuable consideration, receipt of which is specifically acknowledged by each of the parties, the parties hereby agree as follows:

## 1.    Modification

1.1    Anti Capital Asia agrees to return 100,000 USDC of the Capital Deposit (as such term is defined in the May 18 Agreement) promptly following execution of this Modification.

1.2    The parties agree that notwithstanding the fact that the Outstanding Indebtedness of 100,000 USDC was not repaid on the Maturity Date, the aggregate amount of the Outstanding Indebtedness and the remaining 100,000 USDC of the Capital Deposit (collectively, the "*Outstanding Amount*") shall be repaid as follows:

(a)    on the date that is one month following the BLUE token ("*BLUE*") Token Genesis Event ("*TGE*"), if the aggregate value of the aggregate BLUE unlocked and received Anti Capital and Anti Capital Asia (calculated based on the time-weighted average trading price of BLUE for the 7 days prior to such date based on the trading prices reported at www.coinmarketcap.com ("*7-Day TWAP*")) (the "*First Month BLUE Amount*") is equal to or greater than the Outstanding Amount , Anti Capital and Anti Capital Asia agree to immediately repay the Outstanding Amount to Customer. If the First Month Blue Amount is less than the Outstanding Amount, then Anti Capital and Anti Capital Asia agree to repay to Customer such amount in USDC as is equal to the First Month BLUE Amount;

1

(b)    on the date that is two months following the TGE, if the aggregate value of the aggregate BLUE unlocked and received by Anti Capital and Anti Capital Asia (calculated based on the 7-Day TWAP prior to such date) (the "*Second Month BLUE Amount*") is equal to or greater than the Outstanding Amount less the amount paid under Section 1.2(a), then Anti Capital and Anti Capital Asia agree to immediately repay the remaining amount of the Outstanding Amount to Customer. If the Second Month BLUE Amount is less than such remaining Outstanding Amount, then Anti Capital and Anti Capital Asia agree to repay to Customer such amount in USDC as is equal to the Second Month BLUE Amount; and

(c)    on the date that is three months following the TGE, Anti Capital and Anti Capital Asia shall pay the remaining outstanding amount of the Outstanding Amount, if any.

1.3    Anti Capital will keep all Bluefin points or BLUE tokens earned through its trading accounts.

1.4    Customer shall deliver 143,132 BLUE tokens to Anti Capital Asia one month following TGE.

2.    **General Provisions**

**2.1**    The terms and conditions of this Modification shall insure to the benefit of and be binding upon the respective successors and assigns of the parties hereto. Nothing in this Modification, express or implied, is intended to confer upon any third party any rights, remedies, obligations, or liabilities under or by reason of this Modification, except as expressly provided in this Modification.

**2.2**    Other than as set out in this Modification, no modification, amendment or waiver of any provision of this Modification shall be effective unless approved in writing by Anti Capital and Customer.

**2.3**    This Modification and the Loan Agreement set forth the entire agreement and understanding between the parties relating to the subject matter herein and supersedes all prior or contemporaneous disclosures, discussions, understandings and agreements, whether oral or written, between them.

**2.4**    This Modification may be executed in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument. Electronically delivered signatures shall have the same weight and effect as originals.

[*Signature Page Follows*]

IN WITNESS WHEREOF, the parties have executed this Mutual Modification Agreement as of the Effective Date.

**ANTI CAPITAL (UPPER CAYMAN)**

By: _Powen Perng_ (DocuSigned by: 59A2F451B3D2422...)

Name: Powen Perng

Title: Director

Date: 6/11/2024

Email: powen@anticapital.ai

**ANTI CAPITAL ASIA LTD.**

By: _Powen Perng_ (DocuSigned by: 59A2F451B3D2422...)

Name: Powen Perng
Title: Director
Date: 6/11/2024

Email: powen@anticapital.ai

**CUSTOMER:**
**BLUEFIN LABS INC.**

By: _Jonathan Ip_ (DocuSigned by: 7F0D55D0A850404...)

Name: Jonathan Ip

Title: Director

Date: 6/11/2024

Email: Jonathan@firefly.foundation

3